IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 112,701

KEVIN BIGLOW, Individually and on behalf of the Surviving Heirs
of CHARLA E. BIGLOW, Deceased,
*Appellants*,

v.

MARSHALL E. EIDENBERG, D.O.,
*Appellee,*
and
VIA CHRISTI HOSPITALS, WICHITA, INC.,
*Defendant*.

SYLLABUS BY THE COURT

1.

For jury instruction issues, the analytical progression and corresponding standards of review on appeal are: (i) First, the appellate court considers reviewability of the issue from both jurisdiction and preservation viewpoints, exercising an unlimited standard of review; (ii) next, the court uses an unlimited review to determine whether the instruction was legally appropriate; (iii) then, the court determines whether there was sufficient evidence, viewed in the light most favorable to the party requesting the instruction, that would have supported the instruction; and (iv) finally, if the district court erred, the appellate court must determine whether the error was harmless, using the test, degree of certainty, and analysis set forth in *State v. Ward*, 292 Kan. 541, 256 P.3d 801 (2011).

2.

In addressing an instructional error, an appellate court examines jury instructions as a whole, without focusing on any single instruction, in order to determine whether they

properly and fairly state the applicable law or whether it is reasonable to conclude that they could have misled the jury.

3.

K.S.A. 2017 Supp. 60-251(c)(1) requires objections to jury instructions be made on the record, distinctly stating the matter objected to and the grounds for objection. The statute's purpose is to afford the district court an opportunity upon second thought to correct an inadvertent or erroneous failure to instruct the jury on the law applicable to the issues.

4.

Expert testimony is generally required in medical malpractice cases to establish the applicable standard of care and to prove causation, except when lack of reasonable care or existence of proximate cause is apparent to an average layperson from common knowledge or experience. What a reasonable person would do under the same circumstances is irrelevant.

5.

Error predicated on evidence excluded by a pretrial motion in limine must be based on a proffer of the evidence in question during trial, or on a motion for reconsideration.

6.

The scope of oral argument generally lies within the sound discretion of the trial court.

Review of the judgment of the Court of Appeals in an unpublished opinion filed April 15, 2016. Appeal from Sedgwick District Court; TIMOTHY H. HENDERSON, judge. Opinion filed August 24, 2018. Judgment of the Court of Appeals affirming the district court is affirmed. Judgment of the district court is affirmed.

*Jonathan Sternberg*, of Jonathan Sternberg, Attorney, P.C., of Kansas City, Missouri, argued the cause, and *Thomas J. Dickerson* and *Chelsea E. Dickerson*, of Dickerson Oxton, LLC, of Overland Park, were with him on the briefs for appellants.

*Steven C. Day*, of Woodard, Hernandez, Roth & Day, LLC, of Wichita, argued the cause, and *Christopher S. Cole*, of the same firm, was with him on the briefs for appellee.

The opinion of the court was delivered by

BILES, J.:  In this medical malpractice action, Kevin Biglow, the surviving husband of Charla E. Biglow, alleges Marshall E. Eidenberg, D.O., negligently provided emergency medical care, resulting in Charla's death. The jury returned a verdict for the doctor. On appeal, Biglow argues the district court erred when it:  (1) instructed the jury on a physician's right to elect treatment; (2) defined "negligence" and "fault" using a comparative fault pattern instruction; and (3) granted a motion in limine prohibiting Biglow and his expert witnesses from using derivatives of the word "safe" or the phrase "needlessly endangering a patient." A Court of Appeals panel affirmed. *Biglow v. Eidenberg*, No. 112,701, 2016 WL 1545777 (Kan. App. 2016) (unpublished opinion). On petition for review, we affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

Charla developed a cough in October 2009 that persisted for several weeks. Her primary care physician diagnosed her with a viral infection and recommended over-the-counter medication. Her condition did not improve. A week after that visit, Kevin took her to the emergency room at Via Christi Saint Francis Hospital in Wichita around 11 p.m. Charla's chief complaints were the persistent cough, body aches, and a 102.7-degree fever that began that day. Eidenberg was the emergency room physician.

3

When she arrived, Charla's respiratory rate was a little fast and her oxygen saturation level a little low. Around midnight, Eidenberg ordered several laboratory exams, including a chest x-ray, blood work, and urinalysis. Based on the test results, he diagnosed Charla with pneumonia, prescribed medications, and admitted her to the hospital. Charla received Xopenex, a breathing treatment for the lungs.

Afterward, Charla's heart rate increased from 90 beats per minute (bpm) to 170 bpm. A rate over 100 bpm, called tachycardia, is abnormal. Charla told Eidenberg her heart was beating fast. He responded that this was "perfectly normal and not to worry." Eidenberg thought multiple factors affected Charla's heartbeat: the breathing treatment, the pneumonia, the fever, and the over-the-counter medication.

Tachycardia can involve different types of heart rhythms. Sinus tachycardia occurs when the "normal pacemaker" in the heart is "firing faster than usual," but still with a normal sinus rhythm. Eidenberg believed Charla had sinus tachycardia, so he did not order an electrocardiogram (EKG), which would show the heart rhythm's actual electrical waves.

About an hour later, Charla received antibiotics. Thirty to 45 minutes after that, she was taken from the ER to a hospital room. A final vital sign reading showed low blood pressure, continuing high heart and respiratory rates, and a fever. Eidenberg marked her chart "improved" and "stable." A nurse observed that Charla walked "fine" from the transport cart to her bed, seemed "alert and oriented," and was not "confused." Her last vital signs showed "about the same" tachycardia. Charla complained of nausea, which Eidenberg attributed to pneumonia.

4

The nurse left the room to get Charla some ice chips. When she returned, Charla was unresponsive and had no pulse. Other personnel were starting CPR. Heart monitor readings showed Charla's heart was not beating but was experiencing pulseless electrical activity. Charla died.

Kevin pursued this wrongful death action against Eidenberg, Via Christi's parent corporation, and two other individuals: Charla's primary care physician and the respiratory therapist who administered the breathing treatment. Only the claim against Eidenberg proceeded to trial.

The litigation focused on whether Eidenberg violated the standard of care by not using an EKG to identify Charla's heart rhythm and the type of tachycardia she was experiencing. Eidenberg testified that because Charla was a 37-year-old woman with no previous heart disease and a "nice strong pulse" with no objective findings besides the fast heart rate, he believed she had a sinus tachycardia. He said if there was a dangerous abnormal heart rhythm, he would expect to see other things, such as a "change in mental status from confusion to not responding," sweating, and a weak pulse. According to him, "[n]one of that was happening in this case."

*Expert Testimony*

We must detail some expert testimony to better understand the arguments and our outcomes for the issues raised.

Two plaintiff experts agreed Eidenberg breached the standard of care by not ordering an EKG to identify Charla's heart rhythm and failing to identify the type of tachycardia she was experiencing, without which it was impossible to treat the rhythm and provide Charla with appropriate care to save her life. Two defense experts testified

5

Eidenberg acted within the standard of care because an EKG was not required since there were reasonable explanations for her fast heartbeat.

Scott Kaiser, a family physician with emergency room experience treating tachycardia, testified for plaintiff. He said Charla's heart rate could not have shown her heart rhythm, so the actual electrical waves could have been detected only with an EKG. He said any reasonable physician under the circumstances would have ordered an EKG as part of a "differential diagnosis" to rule out conditions that presented similar symptoms. Failing this, it would be "impossible to treat the rhythm and provide care to the patient." Kaiser said Eidenberg breached the standard of care by failing to order an EKG and by not reassessing Charla's condition after the pneumonia treatment.

The second plaintiff expert, Michael Sweeney, a cardiologist familiar with the standard of care for an emergency room physician treating cardiac issues, said Eidenberg breached the standard of care by failing to diagnose and treat Charla's tachycardia by using a rhythm strip or an EKG to identify her specific tachycardia type. Sweeney said an EKG would have been easy to obtain in an emergency room. He testified the typical heart rate increase with Xopenex would be 10 beats or less, so it was unusual that Charla's heart rate nearly doubled to 170 bpm. During cross-examination, Sweeney agreed pneumonia was an appropriate diagnosis and that the general approach to treat sinus tachycardia was to treat the underlying stressor triggering it.

Eidenberg's first expert, Kent Potter, who was residency trained and board certified in emergency medicine, testified Eidenberg "exceeded" the applicable standard of care for an experienced emergency room physician under the same or similar circumstances. Potter testified Eidenberg appropriately diagnosed Charla with pneumonia and that it was proper to prescribe Xopenex. He believed the breathing treatment played a

6

significant role in the heart rate increase and noted Charla's tachycardia likely resulted from fever, pneumonia, and previous episodes of sinus tachycardia.

Potter testified that to determine whether a patient with tachycardia needs an EKG, a physician looks at whether the patient has a primary cardia cause. He explained a patient with tachycardia, combined with other complaints or problems such as pneumonia, generally has sinus tachycardia. The standard of care, he said, does not require the attending doctor to order an EKG. In his experience, Potter had never heard of a patient developing anything other than sinus tachycardia after receiving a breathing treatment. Accordingly, he believed there was nothing that would make any experienced emergency room physician order an EKG for Charla.

Potter further testified that "any experienced emergency physician would come to the conclusion without a doubt that [Charla] had a sinus tachycardia" and "it was consistent with the standard of care to treat the underlying cause of the sinus tachycardia and not treat the tachycardia, itself." He also agreed that any "emergency room physician would have reached an opinion that sinus tachycardia [at the rate that Charla was running] would not pose a threat" to her.

The second defense expert was Jeffery Reames, who was residency trained and board certified in emergency medicine. He testified Eidenberg met the applicable standard of care. He agreed with Eidenberg's pneumonia diagnosis. He said the breathing treatment ordered was appropriate and believed an EKG was not required because there were reasonable explanations for Charla's fast heart rate. Finally, he testified the standard of care did not require Eidenberg to reassess Charla's condition after the antibiotics and fluids were administered.

7

PHYSICIAN'S SELECTION OF COURSE OF TREATMENT

Biglow complains the district court erred by giving Jury Instruction No. 15, which was a modified version of PIK Civ. 4th 123.11 (2012 Supp.), titled "PHYSICIAN'S RIGHT TO ELECT TREATMENT TO BE USED." As given, Instruction No. 15 read:

"Where within a physician's field of medicine there exists *more than one recognized approach to an issue of treatment*, *it is not negligence* for the physician to adopt any such approach if it was a recognized and approved approach within the profession at the time the medical services in question were provided.

"However, the selection must be consistent with the skill and care which other physicians practicing in the same field in the same or similar community would use in similar circumstances." (Emphasis added.)

Biglow claims Instruction No. 15 was factually inappropriate because PIK Civ. 4th 123.11 was for use when there is a dispute whether a physician properly selected between two or more courses of treatment. Biglow argues Eidenberg never considered any treatment at all, simply choosing instead not to test and treat Charla's tachycardia.

*Additional Facts and Background*

At the time of trial, PIK Civ. 4th 123.11, titled "PHYSICIAN'S RIGHT TO ELECT TREATMENT TO BE USED," provided this pattern instruction:

"Where, under the usual practice of the profession of the defendant, _____(*name*), different courses of treatment are available which might reasonably be used, the (*physician*) . . . has a right to use (*his*) (*her*) best judgment in the selection of the choice of treatment.

"However, the selection must be consistent with the skill and care which other (*physicians practicing in the same field in the same or similar community*) . . . would use in similar circumstances."

The "Notes on Use" for PIK Civ. 4th 123.11 indicated, "Where there is a dispute as to which of two or more courses is to be pursued in administering treatment, this instruction should be used. PIK 4th 123.01, Duty of Health Care Provider . . . must also be given." PIK Civ. 4th 123.11.

Prior to Biglow's trial, PIK Civ. 4th 123.11 drew a critical eye in *Foster v. Klaumann*, 296 Kan. 295, 294 P.3d 223 (2013). The *Foster* court held the first paragraph in PIK Civ. 4th 123.11 was not a misstatement of the law as long as the second paragraph was given with it. The court explained this was "because the second paragraph direct[ed] the jury to the objective standard of care, clarifying any potential confusion caused by referencing a physician's right to use the doctor's best judgment." 296 Kan. at 313.

But the court also noted an instruction discussed in *Natanson v. Kline*, 186 Kan. 393, 399, 350 P.2d 1093 (1960), did "a better job of focusing the jury on the issue before it—whether the physician committed malpractice—than the language in PIK . . . 123.11, which state[d] that a physician has a 'right' to exercise his or her best judgment when picking a course of treatment." *Foster*, 296 Kan. at 312; see also *Natanson*, 186 Kan. at 399 (pertinent part of the instruction stated:  "'[I]f among [physicians] more than one method of treatment is recognized, *it would not be negligence* for the physician to have adopted any of such methods if the method he did adopt was a recognized and approved method in the profession at the time and place of treatment.'" [Emphasis added.]).

Prompted by *Foster*, Eidenberg requested an instruction he suggested as "an alternative to PIK 4th 123.11." It read:

9

"Where within a physician's field of medicine there exists more than one recognized approach to an issue of diagnosis or treatment, it is not negligence for the physician to adopt any such approach if it was a recognized and approved approach within the profession at the time the medical services in question were provided."

Eidenberg argued his modifications to PIK Civ. 4th 123.11 were based on both *Foster* and *Natanson*. Biglow argued against the proposal for three reasons. First, he insisted there were not two or more courses of treatment for the doctor to have chosen because the disputes were whether Eidenberg failed to order an EKG to identify the type of tachycardia and failed to adequately monitor or reassess Charla. Second, Biglow claimed the statement that "it is not negligence for the physician to adopt any such approach if it was a recognized and approved approach" was not an accurate statement of the law. Biglow noted the word "negligence" was not used in PIK Civ. 4th 123.11 and the proposed instruction included the "negative language." Lastly, Biglow argued the proposed instruction omitted the second paragraph—"the selection must be consistent with the skill and care which other (*physicians practicing in the same field in the same or similar community*) . . . would use in similar circumstances."

The district court modified Eidenberg's proposed instruction, which it gave as Instruction No. 15. The court deleted the word "diagnosis" and added the second paragraph from PIK Civ. 4th 123.11.

In December 2014, after the Biglow trial, the PIK Committee deleted PIK Civ. 4th 123.11 and replaced it with a "Comment" stating,

"*No separate instruction concerning a physician's selection of treatment is recommended*. The Committee believes the applicable standard of care instruction is sufficient to properly instruct the jury when there is a dispute over the course of treatment

10

selected by the physician. The selection among alternative courses of treatment, like other aspects of medical care provided by a physician, must be consistent with the applicable standard of care.

"The language of the former version of this instruction stating that a physician had a 'right' to exercise his or her best judgment when picking a course of treatment was criticized by the court in *Foster v. Klaumann*, 296 Kan. 295." (Emphasis added.)

*Standard of Review*

"'For jury instruction issues, the progression of analysis and corresponding standards of review on appeal are: (1) First, the appellate court should consider the reviewability of the issue from both jurisdiction and preservation viewpoints, exercising an unlimited standard of review; (2) next, the court should use an unlimited review to determine whether the instruction was legally appropriate; (3) then, the court should determine whether there was sufficient evidence, viewed in the light most favorable to the defendant or the requesting party, that would have supported the instruction; and (4) finally, if the district court erred, the appellate court must determine whether the error was harmless, utilizing the test and degree of certainty set forth in *State v. Ward*, 292 Kan. 541, 256 P.3d 801 (2011) . . . .' [Citation omitted.]" *Foster*, 296 Kan. at 301-02.

In addressing an instructional error, an appellate court examines "'jury instructions as a whole, without focusing on any single instruction, in order to determine whether they properly and fairly state the applicable law or whether it is reasonable to conclude that they could have misled the jury.'" *State v. Hilt*, 299 Kan. 176, 184, 322 P.3d 367 (2014) (quoting *State v. Williams*, 42 Kan. App. 2d 725, Syl. ¶ 1, 216 P.3d 707 [2009]).

*Discussion*

The panel held sufficient evidence supported the district court's decision to instruct on alternative approaches to a treatment issue. *Biglow*, 2016 WL 1545777, at *10. In doing so, it properly noted there was a "fundamental disconnect between the parties' arguments related to the propriety of Instruction No. 1[5] under the facts presented." 2016 WL 1545777, at *9.

"On the one hand, the plaintiff frames the question presented as whether there existed *more than one recognized course of treatment to resolve the tachycardia*. On the other hand, the defendant frames the question as whether there existed *more than one recognized diagnoses for the cause of the tachycardia* (sinus tachycardia as opposed to cardio tachycardia), which in turn dictated the proper course of treatment. The instruction provided to the jury on this issue generally framed the question as whether 'there exists *more than one recognized approach* to an issue of treatment.' Since the definitive or ultimate diagnosis is one upon which a medical treatment program is based, we conclude the instruction as provided was *broad enough to encompass the existence of one or more recognized diagnoses for the cause of the tachycardia*, which in this case was sinus tachycardia as opposed to cardio tachycardia." (Emphases added.) 2016 WL 1545777, at *9.

Biglow's factual-appropriateness argument focuses on the language of PIK Civ. 4th 123.11—"different courses of treatment"—in relation to the case's facts. We note Biglow ignores the trial court's modification to address a situation in which there is "more than one recognized approach" to a treatment issue. Biglow argues there was no such choice because Eidenberg did not treat Charla's tachycardia at all. Accordingly, he claims the "'physician's selection of course of treatment' instruction" was inappropriate.

Biglow insists the real question is "whether it was appropriate for Dr. Eidenberg not to diagnose (and then treat) [Charla's] tachycardia at all, rather than to diagnose and

12

treat it"—not whether two or more courses of treatment were considered by Eidenberg. He argues the doctor violated the standard of care by not testing further to identify the type of tachycardia. In other words, Biglow contends failing to diagnose Charla's tachycardia cannot be a course of treatment as contemplated by PIK Civ. 4th 123.11. We disagree with Biglow's issue characterization.

We find nothing in the record that Charla's tachycardia was anything other than sinus tachycardia as Eidenberg believed. In other words, there is no evidence that diagnosis was wrong. Viewed most favorably to Biglow, the evidence suggests only that Eidenberg should have done more to ensure his diagnosis was correct. Given this, we reject the jury instruction challenge.

As outlined in Instruction No. 14, Biglow claimed Charla was injured due to Eidenberg's

"fault in the following respects:  That [Dr. Eidenberg] failed to provide diagnosis and treatment to Charla . . . by

"a. Failing to perform a differential diagnosis on [Charla]'s tachycardia;

"b. Failing to diagnose [Charla]'s tachycardia by identifying her heart rhythm;

"c. Failing to treat [Charla]'s tachycardia;

"d. Failing to perform an [EKG];

"e. Failing to perform a BNP test;

"f. Failing to perform a blood gases test;

13

"g. Failing to perform a troponin test; and/or

"h. Failing to reassess [Charla] after fluid/medication interventions and before discharging her from the Emergency Room."

Two claims dealt with the treatment Eidenberg adopted:  "c. Failing to treat [Charla]'s tachycardia" and "h. Failing to reassess [Charla] after fluid/medication interventions and before discharging her from the Emergency Room." As to "c," Biglow contended the doctor should have directly treated Charla's tachycardia by medication or other means to bring the heart rate down artificially, while Eidenberg asserted treating her underlying stressors was adequate. As to "h," Biglow claimed the standard of care required Eidenberg to reassess Charla's condition after she was treated for her pneumonia, while the doctor insisted it did not.

The evidence underlying these claims and defenses provided sufficient factual basis to instruct the jury on alternative approaches to treatment issues. Instruction 15 was factually appropriate.

TWO INSTRUCTIONS DEFINING "NEGLIGENCE"

The trial court gave two instructions defining "negligence." Instruction No. 8 defined reasonable-person negligence and Instruction No. 9 defined health-care-provider negligence. On appeal, Biglow challenges Instruction No. 8's legal appropriateness by arguing it confused the jury and allowed it to find Eidenberg acted reasonably using the reasonable person standard. The panel held Biglow raised this challenge for the first time on appeal and concluded Instruction No. 8 was not clearly erroneous. *Biglow*, 2016 WL 1545777, at *12.

14

On review, Biglow makes two arguments. First, he contends the issue was properly preserved, so the panel erred by using the clear error standard of review. Second, he continues to assert the separate reasonable-person negligence definition was legally inappropriate, confused the jury, and prejudiced him.

*Additional Facts*

As given, Instruction No. 8 stated:

"You must decide in this case if the Defendant is at fault. In doing so, you will need to know the meaning of the terms 'negligence' and 'fault'.

"*Negligence is the lack of reasonable care*. It is the failure of a person to do something that a reasonable person would do, or it is doing something that a reasonable person would not do, under the same circumstances.

"A party is at fault when he or she is negligent and that negligence caused or contributed to the event which brought about the claims for damages." (Emphasis added.)

Instruction No. 9 provided:

"A Physician has a duty to use the learning and skill ordinarily used by other members of that same field of medicine in the same or similar communities and circumstances. In using this learning and skill, the Physician must also use ordinary care and diligence. A violation of this duty is negligence."

Also relevant is Instruction No. 11, which provided:

"In determining whether a Physician used the learning, skill, and conduct required, *you are not permitted to arbitrarily set a standard of your own or determine this question from your personal knowledge*. On questions of medical or scientific nature

15

concerning the standard of care of a Physician, only those qualified as experts are permitted to testify. The standard of care is established by members of the same profession in the same or similar communities under like circumstances. It follows, therefore, that *the only way you may properly find that standard is through evidence presented by Physician expert witness*." (Emphases added.)

The preservation issue requires a deeper look. The trial transcript reflects the district court conducted an informal discussion with the parties about instructions the day before the formal jury instruction conference. Because of that, when the court convened the formal conference, it said it wanted to make a record about the informal meeting and "go through the instructions one by one and give everybody a chance to comment as to if they have an objection to it or not."

As to Instruction No. 8, the court began,

"[Biglow] made the point yesterday, he's correct, this is a comparative fault instruction. This is not a comparative fault case. But as we also discussed yesterday, PIK is so interwoven and intertwined that if I chose, and I did, to use the term 'fault' later in the instructions, or even on the verdict, you've got to have somewhere, where you define what fault is. Therefore, I have modified 105.01."

So modified, Instruction No. 8 omitted this language found in PIK Civ. 4th 105.01 (2010 Supp.):

"I am required to reduce the amount of damages you may find for any party by the percentage of fault, if any, that you find is attributable to the party.

"A party will be able to recover damages only if that party's fault is less than 50 percent of the total fault assigned. A party will not be able to recover damages, however, if that party's fault is 50 percent or more."

16

After explaining why it wanted to use the remainder, as set out in Instruction No. 8, the court asked Biglow if he had any objection. Biglow responded,

"Yes, Your Honor. *The only objection I have* is that, of course the Court previously noted, this is not a comparative fault case. It's hard sometimes, and I understand, to reconcile a non-comparative fault case given that a lot of PIK instructions are drafted in terms of comparative fault, so I understand that. What we would suggest instead of course is that our version of the instruction is placed in." (Emphasis added.)

Biglow's proposed instruction, a modified version of PIK Civ. 4th 106.01 (2010 Supp.), in relevant part, stated,

"The Plaintiffs Claim:

"1. That they were injured when Defendant failed to provide diagnosis and treatment to Charla . . . ; and

"2. That such acts/omissions of Defendant that failed to meet the standard of care included the following:

"a. Failing to perform a differential diagnosis on [Charla's] tachycardia;

. . . .

"h. Failing to reassess [Charla] after fluid/medication interventions and before discharging her from the Emergency Room.

"3. That Defendant's acts/omissions listed (a) through (h) above each failed to meet the standard of care and constituted negligence on the part of Defendant; and

"4. That Defendant's negligence caused or contributed to cause the death of Charla. . . .

17

"The Plaintiffs' burden of proof:

"The plaintiffs have the burden to prove that it is more probably true than not true that *Defendant caused or contributed to cause the death of Charla . . . by one or more of the claimed negligent acts/omissions* listed (a) through (h) in Paragraph 2 above. . . ." (Emphasis added.)

Eidenberg then objected on a different issue with Instruction No. 8. The court rejected both parties' objections, including Biglow's "to the concerns about comparative fault and *how we're defining fault and negligence*." (Emphasis added.)

*Preservation*

Biglow insists he properly preserved this issue for two reasons. First, he notes his version of the proposed instructions "contained only the professional negligence definition and excluded the ordinary negligence definition, while including the definition of fault the court indicated it wanted." He argues this suggested opposition to any variation to what he submitted. Second, he relies on the district's court's ruling, "I will overrule [Biglow's] objection to the concerns about comparative fault and *how we're defining fault and negligence*." (Emphasis added.)

Biglow essentially asks us to speculate that he specifically objected on his definition theory during the informal conference. But the transcript reflects this specific objection was not made to the district court as required by statutory procedures. K.S.A. 2017 Supp. 60-251(c) requires a party, who objects to an instruction, to "do so on the record, stating distinctly the matter objected to and the grounds for the objection." Despite the open-ended opportunity to state any objections, Biglow limited his to the grounds that "this is not a comparative fault case."

18

It is Biglow's burden to furnish a record sufficient to support his claim. *Southwestern Bell Tel. Co. v. Beachner Constr. Co.*, 289 Kan. 1262, 1275, 221 P.3d 588 (2009) ("The responsibility for providing a record on appeal sufficient to support a party's argument belongs to that party."). He cannot do so by implying an objection based on his proposed instructions lacking the language he now objects to on appeal. The statute not only requires that objections to jury instructions be made on the record by distinctly stating the matter objected to and the grounds for the objection, but it also sets out when a party is to make those objections—the instructions conference. K.S.A. 2017 Supp. 60-251(c)(2) (party is to object at the opportunity required by [b][2], or if the party was not informed of an instruction before the opportunity to object "and the party objects promptly after learning that the instruction or request will be, or has been, given or refused").

This court has previously noted,

"The purpose of the statute [that requires specific objection] is to afford the district court an opportunity upon second thought, and before it is too late, to correct an inadvertent or erroneous failure to instruct the jury on the law applicable to the issues. The statute also serves to lessen the burden of an appellate court by diminishing the number of rulings at the trial which it may be called upon to review." *Bott v. Wendler*, 203 Kan. 212, 222, 453 P.2d 100 (1969).

Biglow did not afford the district court the opportunity for a second thought as the statute requires. We agree with the panel and hold the definition issue was raised for the first time on appeal, so clear error analysis applies.

19

*Standard of Review*

An appellate court employs the four-step analysis described above when reviewing alleged instructional errors. See *Foster*, 296 Kan. at 301-02. And when a party advances a new ground for challenging a jury instruction not raised with the district court, the appellate court will apply clear error analysis. K.S.A. 2017 Supp. 60-251(d)(2) ("A court may consider an error in the instructions that has not been preserved as required by subsection [d][1] if the giving or failure to give an instruction is clearly erroneous and the error affects substantial rights.").

"[T]o determine whether a challenged jury instruction is clearly erroneous, [the court] must assess whether it is firmly convinced the jury would have reached a different verdict had the instruction error not occurred." *In re Care & Treatment of Thomas*, 301 Kan. 841, 846, 348 P.3d 576 (2015).

*Discussion*

The panel properly noted that "both instructions defining negligence were correct statements of the law." *Biglow*, 2016 WL 1545777, at *13. But the issue is whether both worked together in a way that fairly and accurately stated the applicable law. *Plummer*, 295 Kan. at 161. In this medical malpractice case, we hold Instruction No. 8's recitation about what a reasonable person would (or would not) do under the same circumstances was legally inappropriate.

> "To establish medical malpractice, a plaintiff must show: (1) the health care provider owed the patient a duty of care, which required that the provider meet or exceed a certain standard of care to protect the patient from injury; (2) the provider breached that duty or deviated from the standard of care; (3) the patient was injured; and (4) the injury

20

proximately resulted from the health care provider's breach of the standard of care. *Miller v. Johnson*, 295 Kan. 636, Syl. ¶ 15, 289 P.3d 1098 (2012).

"The duty of care owed by all physicians . . . is to exercise reasonable and ordinary care and diligence. But the particular decisions and acts required to satisfy that duty of care vary, *i.e.*, the required skill depends on the patient's situation and the physician's medical specialty . . . . What constitutes negligence in a particular situation is judged by the professional standards of the particular area of medicine involved. [citation omitted.]" *Foster*, 296 Kan. at 302.

"[E]xpert testimony is generally required in medical malpractice cases to establish the applicable standard of care and to prove causation, except where lack of reasonable care or existence of proximate cause is apparent to an average layperson from common knowledge or experience." *Puckett v. Mt. Carmel Regional Med. Center*, 290 Kan. 406, 435-36, 228 P.3d 1048 (2010). Therefore, what a reasonable person would (or would not) do under the same circumstances is irrelevant. We agree with Biglow that Instruction No. 8 was legally inappropriate, but we further hold its impact was harmless for two reasons.

First, considering the jury instructions as a whole, Instruction No. 8 would not confuse the jury about Eidenberg's duty of care. Instruction No. 9 clearly stated Eidenberg's duty as a physician and provided the health care provider definition for negligence. And Instruction No. 11 told the jury it could only consider expert testimony in determining whether Eidenberg breached the applicable standard of care. Instruction No. 14 supplemented these by detailing the alleged fault.

Building on this, the second reason is that the expert testimony on the standard of care focused exclusively on Eidenberg as a physician. In *Foster*, the parties disputed whether it was proper to issue the general physician standard of care instruction when the specialist standard of care was also provided. Without determining whether the general

21

physician instruction was legally and factually appropriate, the *Foster* court held the challenged instruction "could not have affected the trial's outcome because the only standard of care evidence presented was that of a specialist." 296 Kan. at 307; see also *Douglas v. Lombardino*, 236 Kan. 471, 480, 693 P.2d 1138 (1985) (giving both specialist and general physician instructions could be confusing if there was a dispute whether a doctor was a specialist). *Foster* is particularly instructive because the objection was properly preserved, so the court was viewing the error's impact with more scrutiny, i.e., whether there was no reasonable probability the error contributed to the verdict. *Foster*, 296 Kan. at 305.

We hold Instruction No. 8 was not clear error under these circumstances. We are not firmly convinced the jury would have reached a different verdict had the district court avoided giving it. See *Thomas*, 301 Kan. at 846.

MOTION IN LIMINE

The district court granted Eidenberg's motion in limine, preventing Biglow's counsel and witnesses from using any derivative of the word "safe" or the phrase "needlessly endanger a patient" during trial, because they were "inconsistent with the law in Kansas as to a doctor's duty." On appeal, Biglow argues these concepts are relevant in medical malpractice cases generally and the ruling therefore prevented him from fully presenting standard of care evidence. The panel held the issue was not properly preserved, and even if it were, there was no error and it did not prejudice plaintiff's case. *Biglow*, 2016 WL 1545777, at *16-17.

22

*Additional Facts*

In his motion, Eidenberg provided examples of questions asked of him during a discovery deposition to demonstrate how they would misstate the law, confuse the jury, and be irrelevant and prejudicial. Those questions were:

"Q. Okay. You would agree with me that a *doctor must never needlessly endanger a patient*. Correct?

. . . .

"Q. . . . A doctor must *never needlessly endanger their patient*. Do you understand that question?

. . . .

"Q. . . . A doctor must use *all reasonably available tools* at his [disposal] if it would be medically beneficial to a patient.

. . . .

"Q. . . . A doctor must not discharge or transfer a patient that they are unsure of their condition.

. . . .

"Q. . . . When confronted with two options for treatment, a doctor should prescribe *the safest option* for the patient?" (Emphases added.)

The district court asked Biglow for an example of questions that would be prevented if the court would sustain the motion. Biglow answered:

23

"Well, for instance, you know, on cross-examination with some other experts they believe that—they thought it was not—unnecessary to order a 12-lead EKG. So I would ask them about the standard of care, and I would say, you would disagree with me that the standard of care requires a 12-lead EKG[,] correct? And I would say, if the patient has what could be a life-threatening condition wouldn't the standard of care require that patient to be tested to rule out that life-threatening condition? He would say, yes. I would say, *isn't that a safer option than not doing the test*, and I think that's completely consistent with the standard of care." (Emphasis added.)

The district court granted the motion in limine, reasoning:

"At this time, I am concerned for the reasons I have articulated that safe because of the nebulous nature of the [word] safe is of such a degree that it requires a standard of care which means to be the best, perfect, the most cutting edge, and I do believe that is inconsistent with Kansas law."

Even so, the district court told Biglow it would revisit the limitation at any point during trial. The issue reoccurred on two occasions.

The first was when Kaiser, an expert for Biglow, testified about an emergency room physician's responsibilities. Kaiser said the "physician's job" is "to perform diagnosis," "treatment," and "disposition." Biglow's counsel asked, "Would you say those are the three main responsibilities?" Kaiser answered, "I think so. I think overlying that all *is patient safety*. We do it because we're there to take care of people and help people, but really *the safety*." (Emphases added.) Defense counsel objected, insisting Kaiser's use of the prohibited word—safety—violated the order in limine. Biglow moved to reconsider the order, arguing:

"Your Honor, I believe that—and I don't believe Dr. Kaiser intended to use the word safe. It's just this is—this is so fundamental when we're talking about emergency

24

room medicine and safety. I understand the issue in this case is whether the doctor has breached the standard of care, but there's some underlying things that go with the standard of care, and I believe that we should be able to explain that to the jury.

"One of the main things that we're going to be talking about in this case is . . . whether the appropriate tests were performed and things like that. There's a reason the tests are performed. There's a reason that the diagnosis and treatment should have been provided to this patient and that is because, frankly, *if you don't do those things you endanger the patient's safety and they can die*. That's the core of the case. I think *it underlies the standard of care*. I don't think it's misleading or confusing to the jury. The jury is going to have the instructions, they're gonna have the law, and they're gonna know how to apply it in this case.

"So I don't believe that the use of the word safety, while I know unintentional by Dr. Kaiser, should be excluded from this case entirely. I think that we need leeway to argue in these type of cases and, basically, you know, gagging our mouths so we can't use certain phrases I would, respectfully, submit to the Court that it is a little too broad of a restriction." (Emphases added.)

The court made the same ruling prohibiting the questioning and restated its reasoning: "[I]t is misleading as far as the standard in law in the State of Kansas." The issue did not arise again until just before closing argument when Biglow asked for reconsideration, explaining:

"I wanted to renew my objection to not being able to use the word safety in closing. I think that is an unreasonable prior restraint. We need leeway to argue what the standard of care is and why it is the standard of care and why it's important. I think that is a broad overreach to say that we cannot use the word safety at all."

The district court denied reconsideration.

25

The second occasion came during the jury instruction conference, when the district court declined Biglow's request to use the word "safety" in closing on its determination that "the general term of safe and the derivatives thereof are inconsistent with the law in Kansas as to a doctor's duty."

Biglow claims now that the district court's order in limine erroneously prevented his experts from testifying that: (1) the standard of care required Eidenberg to refrain from needlessly endangering his patient; (2) patient safety is an important part of the standard of care; (3) for these reasons, the standard of care required Eidenberg to test Charla's tachycardia before diagnosing it because the condition may have been lethal; and (4) Eidenberg's failure to order the test compromised Charla's safety, breaching the standard of care and resulting in her death.

*Standard of Review*

A district court's decision on a motion in limine involves a two-prong test. We apply a different standard when reviewing the court's ruling on a motion in limine, depending on which prong or what exact challenge was made to a motion in limine. See *Schlaikjer v. Kaplan*, 296 Kan. 456, 467, 293 P.3d 155 (2013). Under the test, to grant the motion, the district court must determine: (1) the material or evidence in question will be inadmissible at trial; and (2) as opposed to a ruling during trial, a pretrial ruling is justified because (a) the mere offer or mention of the evidence at trial may cause unfair prejudice, confuse the issues, or mislead the jury; (b) the issue's consideration during trial might unduly interrupt and delay trial; or (c) a pretrial ruling may limit issues and save the parties time, effort, and cost in trial preparation. 296 Kan. at 467.

Biglow does not procedurally challenge the order in limine. The argument focuses only on the admissibility of derivatives of the word "safe" or the phrase "needlessly

26

endanger a patient." The district court's rationale was that these terms were inconsistent with Kansas law regarding a physician's standard of care.

In *State v. Shadden*, 290 Kan. 803, Syl. ¶ 4, 235 P.3d 436 (2010), the court laid out the appellate role for the first factor:

"A district court ruling on the first motion in limine factor—*i.e.,* the admissibility of evidence—and an appellate court reviewing that ruling apply a multistep analysis. Under the multistep evidentiary analysis, the first question is relevance. K.S.A. 60-401(b) defines relevant evidence as evidence that is probative and material. On appeal, the question of whether evidence is probative is reviewed under an abuse of discretion standard; materiality is judged under a de novo standard. The second step is to determine which rules of evidence or other legal principles apply. On appeal, this conclusion is reviewed de novo. In the third step of the analysis, a district court must apply the applicable rule or principle. The appellate court's standard of review of this third step varies depending on the rule or principle that is being applied. Some rules or principles grant the district court discretion, while others raise matters of law. Finally, an analysis under K.S.A. 60-445 may be required, depending on the issue and parties' arguments. Under that statute, a district court may exclude evidence if its probative value is substantially outweighed by the risk that its admission will unfairly and harmfully surprise a party who has not had a reasonable opportunity to anticipate that such evidence will be offered. This analysis is reviewed under an abuse of discretion standard."

*Discussion*

Error predicated on evidence excluded by a pretrial motion in limine must be based on a proffer of the evidence in question during trial or on a motion for reconsideration. *Brunett v. Albrecht*, 248 Kan. 634, 640, 810 P.2d 276 (1991). Biglow's first effort at reconsideration during Kaiser's testimony presents difficulties on review.

27

We first dispose of the evidentiary aspects to this issue. We note that no error can arise from the district court's decision to adhere to the order in limine upon Eidenberg's objection to Kaiser's testimony that: "I think so. I think overlying that all *is patient safety*. We do it because we're there to take care of people and help people, but really *the safety*." (Emphases added.) Kaiser's response remained in the record; the jury was not instructed to disregard it, and it was not stricken. There is nothing to appeal from as to that specific question and answer.

Biglow's new claim that this order prevented some expert testimony is not preserved because he never proffered that testimony. In the Court of Appeals, Eidenberg made a preservation argument, which the panel tended to disagree with even though it went on to decide the merits. The panel commented, "[I]t is questionable whether the plaintiff made a satisfactory proffer of the evidence that was in danger of being excluded by the order in limine." *Biglow*, 2016 WL 1545777, at *16. We agree the failure to proffer in greater detail limits what Biglow can challenge now.

We now turn to the remaining issue—the district court's restriction on Biglow using the words "safe and the derivatives thereof" in closing argument. "The scope of oral argument generally lies within the sound discretion of the trial court, and the court's rulings will form no basis for a reversal absent a showing of abuse of discretion." *State v. Francis*, 282 Kan. 120, 143, 145 P.3d 48 (2006). "Abuse of discretion occurs when judicial action is (1) arbitrary, fanciful, or unreasonable; (2) based on an error of law; or (3) based on an error of fact." *Kaelter v. Sokol*, 301 Kan. 247, 250, 340 P.3d 1210 (2015).

To address whether the district court abused its discretion, it is important to understand two interrelated concepts about a physician's duty of care and a physician's standard of care. The duty of care is legally defined. It is owed by all physicians, regardless of medical specialty and it "is to exercise reasonable and ordinary care and

diligence." *Foster*, 296 Kan. at 302. "What constitutes negligence in a particular situation is judged by the professional standards of the particular area of medicine involved." 296 Kan. at 302. "The standard of medical . . . care that is to be applied in any given case is not a rule of law, but a matter to be established by the testimony of competent medical experts." *Nold v. Binyon*, 272 Kan. 87, Syl. ¶ 7, 31 P.3d 274 (2001); see also *Dawson v. Prager*, 276 Kan. 373, 375, 76 P.3d 1036 (2003) ("Expert testimony is necessary to prove a deviation from the standard of care by a health care provider.").

Biglow wanted to use the term "safe" to argue what the standard of care was. Because an attorney may not refer to facts not in evidence during closing argument, the only evidence that could have supported such an argument was Kaiser's testimony that an emergency room physician's job is "to take care of people and help people, but really the safety." Biglow argues this testimony addressed the standard of care, which is a factual question. The trial court and the panel decided it inappropriately rephrases the duty of care. *Biglow*, 2016 WL 1545777, at *16-17. We agree with the trial court and panel.

The district court's ruling was based on Kansas law defining a physician's legal duty of care—a physician has a duty to use the learning and skill ordinarily used by other members of that same field of medicine. Kaiser's broad and abstract statement that a physician's job is to "take care of people and help people, but really the safety" does nothing to establish whether Eidenberg breached that duty by deviating from the standard of care when he did not order an EKG. The trial court did not abuse its discretion in restricting Biglow's use of the word "safe" and discussion of Kaiser's testimony in the closing argument.

Affirmed.