NOT DESIGNATED FOR PUBLICATION

No. 120,893

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Matter of the Marriage of

RYAN FIREOVED,
*Appellant*,

and

KELLEY FIREOVED,
*Appellee.*

MEMORANDUM OPINION

Appeal from Leavenworth District Court; DAN K. WILEY, judge. Opinion filed October 25, 2019.
Affirmed.

*Jeffery A. Sutton*, of Sutton Law Office, L.L.C., of Basehor, for appellant.

*Chadler E. Colgan*, of Colgan Law Firm, LLC, of Kansas City for appellee.

Before SCHROEDER, P.J., PIERRON and STANDRIDGE, JJ.

PER CURIAM:  Kelley Fireoved, Jr. (Father), and Ryan Fireoved, n/k/a Ryan Hall (Mother), divorced in 2013. The district court granted them joint custody of their daughter, K.F., with Mother having residential custody. A few years later, Mother decided to move from Basehor, where both she and Father lived, to Wichita. Father filed a motion for residential custody of K.F. After a trial, the district court granted Father's request and ordered Mother to pay child support. Mother appeals.

1

FACTS

Mother and Father were married in 2010. K.F. was born in 2011. The couple separated in 2012 and their divorce became final in 2013. The district court granted joint legal custody to both parents. Mother had residential custody and Father had visitation from Saturday at 4 p.m. to Tuesday at 7 a.m. Both Mother and Father generally adhered to this plan. Occasionally, they made exceptions to accommodate their respective schedules, but they were usually able to cooperate.

In December 2016, Mother began dating R.H., who lived in Wichita. Mother and R.H. had a daughter, V.H., in November 2017. R.H. also had two children from a previous relationship, ages 9 and 11.

In early 2018, Mother told Father she intended to move to Wichita to live with R.H. Father opposed the move because K.F. would be three hours away from his home in Basehor. He filed a motion to modify parenting time and requested residential custody of K.F. He argued the move would not be in K.F.'s best interests and would negatively affect her relationship with him and her extended family in the Basehor area.

The district court ordered a child custody investigation. In August 2018, the court held a trial at which it admitted the child custody investigator's report into evidence. Father, Mother, and R.H. testified at trial. The following facts come from the report and trial testimony.

Mother and Father both had good relationships with K.F. K.F. had a close bond with her maternal and paternal grandparents, who lived near Father's home in Basehor. K.F. also had an aunt, uncle, and cousins in the Kansas City area.

By the time of the trial, Mother had married R.H. She had been living with R.H., V.H., and R.H.'s two children in Wichita since the end of May 2018. K.F. had formed a bond with V.H. When K.F. was in Wichita, she would play with V.H. every morning and help feed and change her. K.F.'s relationship with R.H.'s children was also "strong," and she often played with them.

At the time of trial, K.F. had finished first grade at Basehor Elementary School. She was a good student and neither parent had any concerns about her grades. Mother and Father were both "very involved" in her education and regularly attended parent-teacher conferences. K.F. was not currently involved in any extracurricular activities.

Father was a project superintendent at Linaweaver Construction in Lansing. He had no set schedule but usually worked 40 to 50 hours a week. He typically worked Monday through Friday 7:30 a.m. to 4:30 p.m. and left home between 6 a.m. and 6:30 a.m. and returned by 5:30 p.m. Father would sometimes choose to work on Saturday because he did not have parenting time with K.F. until 4 p.m., but he was frequently late picking her up on those days. Before Mother had notified Father of her intent to move to Wichita, Father had started dropping K.F. off with Mother on Monday evenings so K.F. could sleep later on Tuesday mornings. If granted residential custody, Father planned to enroll K.F. in a childcare service at Basehor Elementary School run by the Trinity Lutheran church.

Mother worked as a nurse for Via Christi Health Systems. At the time of the trial, she had worked eight days. Her standard weekly schedule was three 12-hour shifts from 7 a.m. to 7:15 p.m.

Father had concerns about K.F. living in Wichita because R.H. smoked. According to Father, K.F. was born premature and was susceptible to respiratory infections. Mother testified R.H. only smoked in their home's detached garage. She also said K.F. had been

3

born with respiratory issues, but doctors had told them they would not be a lifelong problem.

The child custody investigator recommended that Father should have residential custody. In the report, the investigator explained K.F. had a close bond with Father and enjoyed spending time with her grandparents. She also liked her school and friends in Basehor. And while K.F. enjoyed spending time with both parents, she had "a preference for and a desire to live with Dad in Basehor."

Father agreed with the investigator's recommendation, explaining "[K.F.'s] room at my house . . . has always been her room so that's what she knows. The neighborhood is her neighborhood. Her friends are all close, . . . It's, uh, just the community that she's at home with; it is her home." If K.F. were to move to Wichita, she would be three hours away from Father. It would be difficult for him to travel to see her, and his overall time with her would be reduced.

Mother believed K.F. would be better off living with her. Mother had been the primary caretaker for K.F. since she was born. She said she took better care of K.F.'s hygiene than Father, including making sure she had brushed her teeth and hair. She also said Father allowed K.F. to ride in the front seat of his pickup truck, "which is against safety standards for a child."

The district court ultimately granted residential custody to Father. The court also ordered Mother to pay $725 a month in child support starting September 1, 2018. Mother appeals.

ANALYSIS

*Parenting Time*

On appeal, Mother argues the district court erred in granting Father's motion to change residential parent or residential custody. She contends several of the district court's findings are not supported by substantial competent evidence.

We review a district court's modification of custody, residency, visitation, or parenting time for an abuse of discretion. See *In re Marriage of Grippin*, 39 Kan. App. 2d 1029, 1031, 186 P.3d 852 (2008). A judicial action constitutes an abuse of discretion if (1) no reasonable person would take the view adopted by the trial court; (2) it is based on an error of law; or (3) it is based on an error of fact. *Biglow v. Eidenberg*, 308 Kan. 873, 893, 424 P.3d 515 (2018). When a party claims the district court made an error of fact, we review the record to see if substantial competent evidence supports the fact-finding. *Gannon v. State*, 302 Kan. 739, 741, 357 P.3d 873 (2015). Substantial evidence is legal and relevant evidence a reasonable person might accept as being sufficient to support a conclusion. *Cresto v. Cresto*, 302 Kan. 820, 835, 358 P.3d 831 (2015).

When a material change of circumstances is shown, a district court may change or modify any prior order of custody, residency, visitation, or parenting time. K.S.A. 2018 Supp. 23-3218. The party moving to modify the existing court order bears the burden of showing a material change of circumstances. See *Simmons v. Simmons*, 223 Kan. 639, 642, 576 P.3d 589 (1978). A court may consider a child's change in residence as a material change of circumstances. K.S.A. 2018 Supp. 23-3222(c).

In deciding any motion seeking a modification of a prior order based on change of residence, the district court must consider "all factors the court deems appropriate."

5

K.S.A. 2018 Supp. 23-3222(c). These factors include, but are not limited to: "(1) The effect of the move on the best interests of the child; (2) the effect of the move on any party having rights granted under this article; and (3) the increased cost the move will impose on any party seeking to exercise rights granted under this article." K.S.A. 2018 Supp. 23-3222(c).

Additionally, K.S.A. 2018 Supp. 23-3203 provides a list of nonexclusive factors a district court must consider in each child custody case. Relevant here, this list includes:

"(1) Each parent's role and involvement with the minor child before and after separation;

"(2) the desires of the child's parents as to custody or residency;

"(3) the desires of a child of sufficient age and maturity as to the child's custody or residency;

"(4) the age of the child;

"(5) the emotional and physical needs of the child;

"(6) the interaction and interrelationship of the child with parents, siblings and any other person who may significantly affect the child's best interests;

"(7) the child's adjustment to the child's home, school and community;

"(8) the willingness and ability of each parent to respect and appreciate the bond between the child and the other parent and to allow for a continuing relationship between the child and the other parent;

. . . .

"(10) the ability of the parties to communicate, cooperate and manage parental duties;

"(11) the school activity schedule of the child;

"(12) the work schedule of the parties;

"(13) the location of the parties' residences and places of employment;

"(14) the location of the child's school." K.S.A. 2018 Supp. 23-3222.

Finally, K.S.A. 2018 Supp. 23-3201 states: "The court shall determine legal custody, residency and parenting time of a child in accordance with the best interests of the child."

6

In making its ruling, the district court referenced both K.S.A. 2018 Supp. 23-3203 and K.S.A. 2018 Supp. 23-3222, noting it had considered all the factors in both statutes. It held the majority of factors listed in K.S.A. 2018 Supp. 23-3203 either did not apply or did not weigh in favor of either party.

As for the other factors, the court found that some weighed in favor of Mother. As for each parent's role and involvement, the court found both parents had been significantly involved, but Mother had spent more time with K.F. because she was K.F.'s primary caretaker. As for K.F.'s emotional and physical needs, the court found this factor weighed slightly in favor of Mother given her concerns about K.F.'s hygiene. The court also found Mother had a more flexible work schedule.

On the other hand, the court found a number of factors weighed in favor of Father. As for K.F.'s preference, the court found K.F. had expressed a desire to stay with Father. The court noted K.F. was young, so her preference did not carry a lot of weight. But the court noted her preference was understandable, because "that is a setting she knows with staying with her father; a school she's familiar with as opposed to a change; family that's around her."

As for any relationships that may affect K.F.'s best interests, the district court found this weighed in Father's favor because both of K.F.'s grandparents lived near Father. As for K.F.'s adjustment to her home, school, and community, the court found this weighed in Father's favor because K.F. was well-adjusted to her school in Basehor and would be able to continue at that school if she stayed with Father. Finally, the court noted K.F. would have to change schools if she moved to Wichita.

Ultimately, the district court held what weighed most heavily was the stability of the child:

7

"The fact that the child, if the child was left here, would continue in the same school; would sleep in the same house the child has slept in in the past historically; and would have the family around the minor child that the move would cause a lessening of. The relationship with regard to the father as set forth in K.S.A. 23-3222 also weighing with regard to that, but maybe less so as the Court's aware this is a voluntary move on behalf of mother."

Mother challenges three of the district court's findings: (1) K.F. had important family connections in Basehor; (2) K.F.'s adjustment to life in Basehor weighed in favor of Father; and (3) K.F. would have to change schools if she moved to Wichita. She argues substantial competent evidence does not support those findings, and thus those findings do not support the court's ultimate legal conclusion.

First, Mother challenges the district court's determination that K.F. had important family connections in Basehor. She acknowledges Father testified many of K.F.'s family members lived closer to Father's home. But she argues, "other than [Father] identifying these family members being in the community, he offered no evidence that the presence of these family members fostered any kind of a relationship with K.F. to merit any consideration in the decision to be made." Instead, Mother argues the district court should have focused on the testimony about K.F.'s relationship with V.H. and R.H.'s children.

Reviewing the entire record, substantial competent evidence shows K.F. had a significant relationship with her family near Basehor. As stated in the child custody investigation report, K.F. had a close bond with both sets of grandparents. Her maternal grandmother lived one mile away from Father and had cared for K.F. when both Mother and Father were at work. K.F. also regularly went to her paternal grandparents' home and enjoyed hanging out with Father there.

Next, Mother challenges the district court's finding that K.F.'s adjustment to her life in Basehor weighed in Father's favor. She notes she was K.F.'s primary caretaker, so

if K.F. was well-adjusted and doing well in school, this should not weigh in Father's favor. She adds K.F. had only attended preschool in Basehor, so she would not risk losing any longstanding relationships by moving to Wichita. She also argues K.F. would have to develop new relationships when she attended before and after school care, and she would have less time during the work week to spend with Father because of his work schedule.

As a point of correction, K.F. had finished first grade at the time of the trial, not preschool. Although Mother may have been K.F.'s primary caretaker, K.F. spent three out of seven nights a week with Father under the original parenting plan. Additionally, Mother, Father, and K.F.'s teacher all stated Father was involved in K.F.'s education. Finally, no evidence was introduced about whether K.F. already knew the other children attending Trinity Lutheran's childcare.

As for her argument that Father would spend less time with K.F. during the work week, Mother engages in a hypothetical calculation using numbers unsupported by the record or manipulated to favor her position. Father testified he usually left for work between 6 a.m. and 6:30 a.m. and usually returned home by 5:30 p.m. Presumably based on this testimony, Mother states K.F. would have to "get up before 6:00 every day to be dropped off at [child care] by 6:00 a.m. and would be retrieved by [Father] at 5:30 p.m. and then travel home, 5 days a week." From this information alone, she concludes K.F. would "only be with [Father] somewhere around 12 or 13 hours per work week."

Mother then contrasts this with the proposed amount of time K.F. would be able to spend with Mother during the work week. Mother testified she worked three 12-hour shifts per week. She also testified K.F.'s bedtime was around 8 p.m. to 8:30 p.m. during the school year. From this, Mother concludes K.F. would have "a couple more hours a week" with Mother if all of Mother's shifts occurred during the work week and "[g]iven that [Mother] would have some time with K.F. in the morning and evenings on her work days and a[t] least from 3:00 when school lets out until 8:30 p.m." She adds, "should two

9

of [Mother's] workdays fall on a weekend when [K.F.] had parenting time at [Father's], the time with the [Mother] would have doubled over the time available to [Father]."

Mother's calculations contain a number of problems. For instance, Mother has chosen times and scenarios which minimize the potential time Father could spend with K.F. but maximize the potential time she could spend with K.F. She does not cite to the record to support her assertion that the school K.F. would attend in Wichita lets out at 3 p.m. Nor does she fully explain how she reached the conclusion that Father would only be able to spend 12 or 13 hours with K.F. during the work week.

Ultimately, Mother is asking us to reweigh the evidence, which we do not do. The record shows K.F. was well-adjusted to her school in Basehor. The district court reasonably concluded that K.F. would be able to continue at this school if Father had residential custody. Thus, Mother's arguments fail.

Finally, Mother challenges the district court's finding that if she had residential custody, K.F. would have to change schools. She argues the court "missed the point of this factor" because "[i]n probably every case where a motion is filed to change parenting time based upon a relocation, it would almost necessarily mean a change in schools." Instead, she proposes this factor "revolves around what extra impediments are introduced into the attendance of school beyond what is presently experienced."

For support, Mother cites *In re Marriage of Nemec*, No. 115,474, 2016 WL 6031300 (Kan. App. 2016) (unpublished opinion). In *Nemec*, the mother and father had shared residential custody of their three children "as long as the parties are residing in the same community and the children can attend the same school district without difficulty." 2016 WL 6031300, at *1. The district court ordered the father would have residential custody if the mother moved outside of the St. John school district.

10

The mother later planned to move to Pratt, approximately a 30-minute drive from St. John. She presented a plan to show how the shared residential custody could still continue. She suggested she would drive the children to school every morning before returning to Pratt to work. After school, the older children would wait in the library for the two hours before she was able to pick them up, while the youngest child would go to daycare. On days when the children had after school activities, she would make multiple trips to and from Pratt and would rely on friends and babysitters to make the plan work.

The district court in *Nemec* found the proposed move would present significant difficulties. The court found it was impractical for the children to spend two hours at the library after school waiting for their mother to pick them up. And it found the plan to accommodate the children's activities was unworkable. It also found the additional travel time would impose a significant burden on the children. The *Nemec* court affirmed the district court on appeal. 2016 WL 6031300, at *4-5.

Mother argues "[s]omewhat similar to *Nemec*" that the district court should have considered the "arduous impediments" imposed on K.F. by living with Father and continuing to attend school in Basehor. But *Nemec* is distinguishable. The family in *Nemec* had three children, as opposed to one, and two of those children would have to spend around two hours a day in the library, waiting for their mother to pick them up. Unlike K.F., the children had afterschool activities, which further complicated the logistics of the mother retaining shared residential custody. The children would have to spend around an hour a day commuting to and from school, while the record here does not establish how much time K.F. would have to spend traveling.

In all these challenges, Mother is asking us to reweigh the evidence and find in her favor. But that is not our role. As the Kansas Supreme Court has explained,

11

"Our function is not to delve into the record and engage in the emotional and analytical tug of war between two good parents over two good children. The district court was in a better position to evaluate the complexities of the situation and to determine the best interests of the children. Unless we were to conclude that no reasonable judge would have reached the result reached below, the district court's decision must be affirmed." *In re Marriage of Bradley*, 258 Kan. 39, 45, 899 P.2d 471 (1995).

Substantial competent evidence supports the district court's findings in this case, and a reasonable person could agree with the court's ruling. As a result, Mother has failed to show the district court abused its discretion.

*Child Support*

Next, Mother argues the district court made two errors in determining her child support obligation. First, she claims the district court failed to use the multi-family application. Second, she asserts substantial competent evidence does not support Father's credits for child care costs and health and dental insurance premiums.

The Kansas Child Support Guidelines (2018 Kan. S. Ct. R. 79) (Guidelines) are the basis for establishing and reviewing child support orders in Kansas. "Use of the guidelines is mandatory and failure to follow the guidelines is reversible error." *In re Marriage of Thurmond*, 265 Kan. 715, 716, 962 P.2d 1064 (1998).

The standard of review for child support issues varies with the issue. Interpretation of the Guidelines is a question of law subject to unlimited review. 265 Kan. at 717. But we review an order establishing child support for substantial competent evidence. *In re Marriage of Brand*, 273 Kan. 346, 350, 44 P.3d 321 (2002).

To begin with, Mother has not adequately briefed this issue. She does not cite any authority to support her argument. In fact, her entire argument on this issue is four

sentences long. As such, she has abandoned this issue. *In re Marriage of Williams*, 307 Kan. 960, 977, 417 P.3d 1033 (2018). That said, her argument on the multiple-family application appears to be without merit. Her argument about childcare costs and health insurance premiums is unclear.

*Multiple-Family Application*

The multiple-family application is a credit available to a parent who does not have primary residency and lives with and supports other children. As explained in the Guidelines,

> "The multiple-family application may be used to adjust the child support obligation of the parent not having primary residency when that parent has legal financial responsibility for the support of the other children who reside with that parent. The multiple-family application may be used only by a parent not having primary residency when establishing an original order of child support or an increase in support is sought by the parent having primary residency. If using the multiple-family application will result in a gross child support obligation . . . below the poverty level, the use of the multiple-family application is discretionary." Kansas Child Support Guidelines § III.B.6 (2018 Kan. S. Ct. R. 85).

Mother argues the district court should have used the multiple-family application because Mother lived with and supported V.H. But Mother does not appear to have asked for its use. She does not cite any authority to suggest the court had to use the application despite her failure to request it. In fact, the Guidelines' language suggests the application is discretionary, as the application "*may* be used to adjust the child support obligation of the parent not having primary residency." (Emphasis added.) Kansas Child Support Guidelines § III.B.6 (2018 Kan. S. Ct. R. 85); see also 2 Elrod, Kansas Law and Practice: Kansas Family Law § 14:21 (2017-2018 ed.) ("If the custodial parent seeks an increase in child support, the noncustodial parent *may ask* to have child support figured on the total

13

number of children that the obligor is legally obligated to support." [Emphasis added.]). Mother failed to raise this defense before the district court, and she has failed to show she is entitled to a remand for another chance to do so.

In *In re Marriage of Johnson*, 24 Kan. App. 2d 631, 638, 950 P.2d 267 (1997), the court held "the guidelines require using the Multiple Family Adjustment in determining the level of child support when an increase in support is sought by the custodial parent and the noncustodial parent has children by another relationship who reside with him or her." The *Johnson* court did not explain how it reached this conclusion, and it is not apparent from the opinion because it primarily discusses how to calculate the credit for health insurance premiums. Apparently, though, the Guidelines used to state, "The Multiple Family Adjustment *is* used . . . ." Kansas Child Support Guidelines § II.L. (2000 Kan. Ct. R. Annot. 10.) The wording was later changed to "*may* be used." (Emphasis added.)

*Childcare and Health Insurance Costs*

Child support is calculated by completing a child support worksheet, and courts must consider all relevant evidence in setting a child support amount. Kansas Child Support Guidelines § III.B.6 (2018 Kan. S. Ct. R. 82). In calculating child support, the cost of the child's health and dental insurance as well as "[a]ctual, reasonable, and necessary child care costs paid to permit employment . . . of a parent" are added to the gross child support obligation. The court has discretion to determine whether the proposed insurance or childcare costs are reasonable, "taking into consideration the income and circumstances of each of the parties." Kansas Child Support Guidelines §§ IV.D.4.a. and IV.D.5. (2018 Kan. S. Ct. R. 94). Those amounts are then credited to the parent who pays them before determining each parent's basic support obligation. Kansas Child Support Guidelines §§ IV.D.8. and IV.D.9. (2018 Kan. S. Ct. R. 96).

14

A week before trial, Father filed a child support worksheet, claiming he paid $474 in health and dental insurance premiums for K.F. as well as $368 for childcare. The record does not include an accompanying domestic relations affidavit for Father's worksheet, which is required by the Guidelines. Kansas Child Support Guidelines § III.A. (2018 Kan. S. Ct. R. 83). Mother did not raise this issue before the district court and does not raise it now. She appears not to have filed either a worksheet or an affidavit in response, though the record does include the worksheet and affidavit she filed in the original divorce action. The district court ultimately adopted Father's worksheet.

On appeal, Mother argues the credits for insurance premiums and childcare costs are not supported by substantial competent evidence. Father responds he presented evidence at trial to support both numbers. He notes he presented a paystub for a one week period in July 2018, with a $121.94 deduction for "Pretax Medical Insurance" with a year-to-date amount of $3,179.54; and a $15.95 deduction for "Delta Dental" with a year-to-date amount of $427.57. He also presented a text conversation in which he told Mother that K.F.'s childcare cost was $85 a week. The district court admitted both into evidence.

While these exhibits provide possible numbers, it is questionable whether they are sufficient to support the amount of the credits. It is not clear how Father calculated the amounts entered on the worksheet from the information on his paystub and in the text message. Additionally, the text message was actually admitted into evidence to show the deterioration in Mother and Father's relationship, not the cost of childcare.

One possible resolution to this issue is found in § I. of the Guidelines:

> "The calculation of the respective parental child support obligations on Line D.9
> of the worksheet is a rebuttable presumption of a reasonable child support order. If a
> party alleges that the Line D.9 support amount is unjust or inappropriate in a particular

15

case, the party seeking the adjustment has the burden of proof to show that an adjustment should apply. If the court finds from relevant evidence that it is in the best interest of the child to make an adjustment, the court shall consider Section E of the Child Support Worksheet. The completion of Section E of the worksheet shall constitute the written findings for deviating from the rebuttable presumption." Kansas Child Support Guidelines § I. (2018 Kan. S. Ct. R. 79).

In *In re Marriage of Shannon*, 20 Kan. App. 2d 460, 889 P.2d 152 (1995), the court relied on this "rebuttable presumption" language to uphold the reduction of a parent's child support obligation. There, a father moved for a reduction of his child support obligation, presenting a child support worksheet. SRS argued the father's child support obligation should not be reduced because he may have understated his income on his worksheet, but it did not present any evidence. The district court granted the father's motion.

On appeal, SRS argued the district court abused its discretion by reducing the father's child support obligation based only on his child support worksheet without hearing any evidence. But the *Shannon* court rejected this argument. It noted courts must follow the Guidelines, and the Guidelines provide that the calculation of child support obligations in line D.9 of the worksheet creates a rebuttable presumption of a reasonable child support order. Because SRS did not present any evidence to rebut that presumption, the district court did not err in relying on the worksheet only. 20 Kan. App. 2d at 463.

Admittedly, the language in § I. does not seem entirely clear. It seems this section could also be read to provide a way for district courts to depart from the Guidelines if a party believes the Guidelines resulted in an unjust child support obligation and could prove that one of the adjustments in Section E. of the worksheet should apply. The adjustments for insurance and child care are not in Section E.—they're in Section D. Mother is not arguing the Guidelines themselves result in an unjust obligation—she is arguing Father did not provide evidence of the amounts used to calculate that obligation.

16

That said, under *Shannon*, Mother's argument fails because she did not rebut the presumption of a reasonable child support obligation as listed in Father's worksheet. The district court is affirmed.

Father has filed a motion for attorney fees and costs. After review, we grant the motion based on the affidavit of attorney fees and costs submitted as exhibit "A" in the requested amount of $8,762.50. We have considered the request, and under KRPC 1.5 (2019 Kan. S. Ct. R. 300) we find it to be reasonable.

Affirmed.