NOT DESIGNATED FOR PUBLICATION

No. 122,230

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interest of R.J.,
A Minor Child.

MEMORANDUM OPINION

Appeal from Sedgwick District Court; KEVIN M. SMITH, judge. Opinion filed January 15, 2021.
Affirmed.

*Anita Settle Kemp*, of Wichita, for appellant father and father, appellant pro se.

*Jennifer M. Hill*, of McDonald Tinker PA, of Wichita, for appellee.

Before BUSER, P.J., ATCHESON, J., and BURGESS, S.J.

PER CURIAM: This is an appeal of the district court's judgment finding that R.J., a
minor child born in 2006, is a child in need of care as to his Father and that due to
Father's unfitness, his parental rights should be terminated. On appeal, Father raises
several procedural issues and matters challenging the sufficiency of the evidence. Upon
our review, we conclude that none of the issues raised by Father merit the reversal of the
district court's judgment. Accordingly, we affirm.

BRIEF FACTUAL AND PROCEDURAL BACKGROUND

On November 20, 2018, Mother filed a combined pleading comprised of a private
child in need of care (CINC) petition on behalf of her son, R.J., and a motion to terminate
Father's parental rights. The district court appointed an attorney to represent Father.
Pretrial hearings were held at which time the district court issued rulings which are

discussed in the analysis section of this opinion. On September 5, 2019, four days before the termination hearing, Father filed a pro se counter petition for termination of parental rights in which Father made several claims against Mother. The counter petition is not an issue in this appeal.

On September 9, 2019, the district court held a hearing on the combined motion relating to Father's parental rights to R.J. After addressing pretrial issues, which are discussed later in this opinion, Mother presented the testimony of Amy Meek, a licensed therapist who began counseling R.J. in July 2018. This counseling continued to the time of the termination hearing.

As detailed later during her testimony, Meek opined about R.J.'s mental and physical health, his feelings towards Father, and his issues with safety, trust, and trauma. Meek testified that, in her opinion, it was in R.J.'s best interests to terminate Father's parental rights. Mother rested her case at the end of Meek's testimony.

Father was the sole witness in his case in chief. Among other topics, Father testified he was currently incarcerated after a jury convicted him in 2012 of two counts of solicitation to commit murder in the first degree. The proposed victim of the scheme was Father's ex-wife and R.J.'s mother. Although Father was unsuccessful in his direct appeal, he indicated he had filed a motion to correct an illegal sentence before the Kansas Court of Appeals, and a habeas corpus action was pending before the federal district court. As a result, Father testified he was "100 percent confident" his criminal convictions would be reversed, and he would be out of prison sometime before March 4, 2022—his earliest possible release date.

At the conclusion of the evidence, the district court found Father was unfit to parent R.J. under K.S.A. 2019 Supp. 38-2269(b)(4), (b)(5), (b)(7), (b)(8), (c)(2), (c)(3), and (d). In particular, the district court found Father's solicitation attempts to murder

Mother "inflicted severe psychological abuse upon the child" under subsection (b)(4) and Father's convictions qualified to establish unfitness under subsection (b)(5) because the convictions were severity level 3 person felonies. The district court also found that based on Father's release date, R.J. probably will not see Father until after he is 18 years old. Upon considering child time and the physical, mental, and emotional health of R.J., the district court concluded it was in R.J.'s best interests to terminate Father's parental rights. Regarding the CINC petition, the district court specifically made findings under K.S.A. 2019 Supp. 38-2202(d) and K.S.A. 2019 Supp. 38-2251 in concluding that R.J. was a child in need of care.

Father appealed and was appointed appellate counsel who filed a brief on his behalf. Subsequently, Father also filed a pro se supplemental brief.

PROCEDURAL ISSUES

At the outset, Father raises a variety of procedural issues relevant to the proceedings in the district court. We will address those issues individually.

*Jurisdiction and Venue of the Proceedings*

In his pro se supplemental appellate brief, Father claims that Sedgwick County was not the proper jurisdiction or venue to conduct these proceedings. Father initially sought to transfer venue from Sedgwick County District Court to Johnson County District Court at the January 2019 hearing. He argued the proceedings should be transferred to Johnson County because that is the county which had jurisdiction over Father's criminal case and Mother and Father's divorce action. In response, Mother argued that venue was statutorily authorized under K.S.A. 2019 Supp. 38-2204(a) because Mother and R.J. resided in Sedgwick County when the petition was filed. The district court denied

3

Father's motion and held that jurisdiction and venue were appropriate in Sedgwick County.

On appeal, Father contends the Sedgwick County District Court lacked jurisdiction to consider this CINC action because the Johnson County District Court had acquired jurisdiction when it "issued orders, e.g., protective custody and removal of [R.J.] from custody of Mother" and this jurisdiction "still is continuous over [R.J.]." Father also asserts that venue was improper in Sedgwick County because he does not reside there and his home "remain[s] in Johnson County, KS" despite his incarceration in Hutchinson.

Whether jurisdiction exists is a question of law over which our court's scope of review is unlimited. *In re Care & Treatment of Emerson*, 306 Kan. 30, 34, 392 P.3d 82 (2017). Venue is a matter of jurisdiction. *State v. McElroy*, 281 Kan. 256, 264, 130 P.3d 100 (2006), *overruled on other grounds by State v. Dunn*, 304 Kan. 773, 375 P.3d 332 (2016). Whether venue is proper is a question of law over which an appellate court has unlimited review. *Foster v. Kansas Dept. of Revenue*, 281 Kan. 368, 369, 130 P.3d 560 (2006); *McElroy*, 281 Kan. at 264. In Kansas, statutes determine the proper venue for CINC proceedings. The interpretation and application of a statute is likewise a question of law over which an appellate court has unlimited review. *See LSF Franchise REO I v. Emporia Restaurants, Inc.*, 283 Kan. 13, 19, 152 P.3d 34 (2007).

Under K.S.A. 2019 Supp. 38-2203(c), a district court "acquires jurisdiction over a child by the filing of a petition pursuant to this code." The jurisdiction "may continue" until the child becomes 18 years old, has been adopted, or has been discharged by the court. K.S.A. 2019 Supp. 38-2203(c). Moreover, relevant to this appeal, as a general rule, any order issued under the revised Kansas Code for Care of Children (KCCC) "shall take precedence over such orders in a civil custody case." K.S.A. 2019 Supp. 38-2203(f). As a result, as opposed to Johnson County, the Sedgwick County District Court correctly determined it had jurisdiction upon the filing of the CINC petition in Sedgwick County.

Sedgwick County was also the appropriate venue to file the CINC petition. Under K.S.A. 2019 Supp. 38-2204(a): "Venue *of any case involving a* [*CINC*] shall be in the county of the child's residence or in the county where the child is found." (Emphasis added.) Here, the record shows R.J. had been living in Sedgwick County for six years. Father concedes Sedgwick County "might be [the] proper venue for the CINC action" but claims it is improper for the "termination of parental rights action" because Father does not live there. But, as stated in K.S.A. 2019 Supp. 38-2204(a), Sedgwick County would be appropriate for termination proceedings because Father's termination is "any case involving a [CINC]." As a result, the district court did not err in finding venue was proper in Sedgwick County and declining to transfer venue to the Johnson County District Court.

*Claim of a Due Process Violation*

For the first time on appeal, Father contends he was denied due process when the district court failed to hold a separate hearing for adjudicating R.J. as a child in need of care instead of combining the adjudication and termination matters at the time of the termination hearing. Father argues Kansas statutory and common law require adjudication to occur before proceeding to termination and the district court's failure to adhere to this procedure violated his due process rights to "be heard at a meaningful time in a meaningful manner."

This case began with Mother filing a combined pleading comprised of a private CINC petition on behalf of her son, R.J., and a motion to terminate Father's parental rights. The record reveals that, without Father's objection, the adjudication phase and termination phase were combined throughout the pretrial hearings and termination hearing.

5

On April 12, 2019, the district court held a pretrial conference. At this hearing, the district court inquired whether, given the fact that Father was incarcerated, he wished to stipulate to R.J. being a child in need of care. Father declined. The district court acknowledged Father's position and noted that presentation of evidence about the CINC matter would not take very long and the matter of parental fitness was the principal issue in the proceeding. The district court indicated that the CINC adjudication "will be the first thing we will take up at the hearing."

Three months after the pretrial conference, the district judge initially assigned to the case recused himself and the case was transferred to Judge Kevin M. Smith, who presided over the termination hearing. At the termination hearing, the parties addressed pretrial issues and proceeded with the presentation of evidence. After the district court determined that Father was unfit to parent and it was in R.J.'s best interests to terminate Father's parental rights, Mother's counsel asked the district court to make specific findings that R.J. was a child in need of care. The district court complied.

Preliminarily, although Father had numerous opportunities to object to the conduct of the combined proceedings in the district court, he did not object at any time. This is important because issues not raised before the trial court may not be raised on appeal. *Wolfe Electric, Inc. v. Duckworth*, 293 Kan. 375, 403, 266 P.3d 516 (2011). While there are three primary exceptions to this general rule, on appeal Father does not assert any exception. See *State v. Phillips*, 299 Kan. 479, 493, 325 P.3d 1095 (2014) (listing exceptions).

As provided in *State v. Williams*, 298 Kan. 1075, Syl. ¶ 4, 319 P.3d 528 (2014):

"Supreme Court Rule 6.02(a)(5) (2013 Kan. Ct. R. Annot. 39-40) provides that a party briefing an issue on appeal must make a reference to the specific location in the record on appeal where the issue was raised and ruled upon. If the issue was not raised

6

below, there must be an explanation why the issue is properly before the court. A party failing to explain why an issue being raised for the first time on appeal is properly before the court risks having that issue deemed waived or abandoned."

Of particular relevance given the due process issue that Father raises on appeal for the first time, is *State v. Godfrey*, 301 Kan. 1041, 350 P.3d 1068 (2015). In *Godfrey* the defendant in a criminal case sought to raise a due process argument for the first time on appeal. Our Supreme Court, citing Supreme Court Rule 6.02(a)(5) (2014 Kan. Ct. R. Annot. 40), held that it

"requires an appellant raising a constitutional issue for the first time on appeal to affirmatively invoke and argue an exception to the general rule that such claims may not be raised for the first time on appeal. Failure to satisfy Rule 6.02(a)(5) in this respect amounts to an abandonment of the constitutional claim." 301 Kan. 1041, Syl.

Moreover, citing *Williams*, the Supreme Court reiterated, that "Rule 6.02(a)(5) means what it says and is ignored at a litigant's peril." *Godfrey*, 301 Kan. at 1043. Godfrey's due process claim was not reviewed by our Supreme Court.

Father's failure to object to the combined CINC and termination proceedings in the district court is consequential. This failure resulted in the district court not having an opportunity to rectify any infirmities in the conduct of the proceedings. We find this omission precludes our appellate review. Moreover, Father also failed to comply with Supreme Court Rule 6.02(a)(5) (2020 Kan. S. Ct. R. 34) because he did not "affirmatively invoke and argue" an exception to the general rule against raising new issues for the first time on appeal. On this additional basis, Father's statutory and due process claims are not properly before us, and we find the issue is waived or abandoned. *Williams*, 298 Kan. 1075, Syl. ¶ 4.

7

Lastly, assuming Father's contention is correct and the district court erred when it terminated Father's rights at the same hearing it adjudicated R.J. as a child in need of care, he does not show that his statutory or due process rights were adversely affected by this procedure. Our review of the record on appeal shows that despite Father's complaint that the combined proceedings prevented him from being heard at a meaningful time and in a meaningful manner, he fails to show how the procedure employed by the district court limited his ability to question Mother's witness or challenge her evidence, present his testimony and evidence, and make arguments to the district court. In short, Father has failed to show how the combined proceeding adversely impacted his statutory or due process rights in any way.

*Failure to Inform R.J.'s Prior Guardian Ad Litem About the Proceedings*

In his pro se appellate brief, Father asserts the district court erred by not informing Valerie Moore, who served as guardian ad litem (GAL) for R.J. in the Johnson County divorce proceeding about the Sedgwick County CINC and termination proceedings. Father claims that Moore could have provided favorable information regarding his relationship with R.J. and unfavorable information about Mother's relationship with her son. Father asserts that Moore is R.J.'s "permanent" GAL. Of note, in the current proceedings, R.J. is represented by a GAL appointed by the Sedgwick County District Court.

We are persuaded that Father's claim of error is not meritorious. First, Father has not provided our court with any legal precedent that mandates that a district court in a CINC proceeding has a legal obligation to notify a GAL in a previous divorce proceeding in another county about the latest CINC proceeding involving the same child. Failure to support a point with pertinent authority is akin to failing to brief the issue. *In re Adoption of T.M.M.H.*, 307 Kan 902, 912, 416 P.3d 999 (2018). Second, Father does not explain why he, personally, or his counsel in the CINC or divorce proceedings could not have

8

contacted Moore to advise her of the CINC proceedings or to subpoena her attendance at the termination hearing. This was not the responsibility of the district court.

Lastly, Father has not shown prejudice. Although he conclusively asserts that Moore had information that could have benefitted Father's case, he has not identified any such testimony or documents. Our review of the record, however, discloses that Moore possessed information unfavorable to Father's case. For example, Moore filed a pleading in Johnson County District Court seeking to terminate Father's rights to visitation in the divorce proceeding based on his arrest for soliciting Mother's murder. Under all these circumstances, we find the district court did not err.

*Notice to Paternal Grandparents Regarding the Termination Hearing.*

Father complains that R.J.'s paternal grandparents did not receive written notice of the termination hearing. In proceedings regarding the termination of parental rights, K.S.A. 2019 Supp. 38-2267(a) and (b)(1) require the district court to provide notice of the hearing to the child's grandparents at their last known address. At the beginning of the hearing, the district court must determine whether due diligence has been exercised in determining the identity and location of a child's grandparents and in accomplishing service of process. K.S.A. 2019 Supp. 38-2267(c).

The paternal grandparents are divorced. At the termination hearing, the district court heard arguments from the parties and conferred with a court service officer (CSO), who stated that she spoke with paternal grandmother a week before the hearing and grandmother was informed of the hearing date and time. Mother's counsel stated she had sent paternal grandfather written notice of the two prior hearings, but she did not send written notice of the latest termination hearing. Mother's counsel also stated that paternal grandfather had not "filed anything related to this matter" and he had not contacted her or

the CSO since the proceedings began. The CSO then attempted to contact paternal grandparents by telephone from the courtroom, but she was unable to contact either one.

After hearing extended arguments, the district judge ruled:

"[F]irst of all, I do acknowledge that as far as objecting based on notice, typically the party who doesn't receive the notice is the one that has to make the motion. Based on that, Father does not have standing to challenge either grandparent's notice.

"As to [paternal] Grandmother, based on the statements that are already on record, I do find that Grandmother has been provided notice of this hearing.

"Additionally, pursuant to K.S.A. 38-2267(b)(3), it states, 'The provisions of this subsection shall not require additional service to any party or interested party who could not be located by the exercise of due diligence in the initial notice of the filing of a petition for a [CINC].'

"I do acknowledge that [Mother's counsel] did what she is required to do under statute. She did at least send by U.S. mail notice for at least two hearings to paternal grandfather. At no point did he file an entry in this case. At no point has he appeared in his case. That would indicate to me that it's possible that effectively—since Grandfather didn't respond, that he effectively could not actually be located.

"So in that case, number one, I do find that [Mother's counsel] did exercise due diligence in sending that notice via U.S. mail, but, second, I don't find any additional actions were required since, again, paternal grandfather never responded to that notice that was provided.

"And, again, just to reiterate, Grandfather needs to actually assert any objection based on the notice issue. And, again, I further reiterate that Grandmother was noticed and acknowledged that notice by engaging in conversation with [the CSO], as well as filing her motion for interested party status."

On appeal, Father does not object to any of the factual findings made by the district court. He also does not challenge or brief arguments regarding the district court's ruling that Father lacked standing to object to any deficient notice provided to the paternal grandparents. Lastly, he "does not contest the district court's 'due diligence'

10

finding." Instead, Father contends the district court made an error of law because "[s]ervice was not attempted, and lack of service is reversible error if Father can establish prejudice."

At the outset, Father's failure to appeal the district court's ruling that he lacked standing to object on behalf of the paternal grandparents is consequential. It is well settled law that an issue not briefed is deemed waived or abandoned. *State v. Arnett*, 307 Kan. 648, 650, 413 P.3d 787 (2018). There is another reason Father's failure to brief the district court's ruling on standing is important. When a district court provides alternative bases to support its ultimate ruling on an issue and an appellant fails to challenge the validity of *both* alternative bases on appeal, an appellate court may decline to address the appellant's challenge to the district court's ruling. *National Bank of Andover v. Kansas Bankers Surety Co.*, 290 Kan. 247, 280, 225 P.3d 707 (2010).

In the present case, the district court ruled that Father did not have standing to object to notice and that notice was proper according to statutory requirements. Father only contests the latter basis for the district court's ruling and does not brief the former basis. Accordingly, we find this issue is waived or abandoned, and we decline to review Father's complaint regarding notice to the paternal grandparents.

Finally, we note another failure by Father on appeal. He acknowledges in his brief that any error in giving notice to the child's grandparents is grounds for reversal only if there is a showing of prejudice. See *In re Ch.W.*, No, 114,034, 2016 WL 556385, at *8 (Kan. App. 2016) (unpublished opinion).

Assuming there was error in the alternative ruling made by the district court, Father does not establish that any lack of notice was prejudicial to him. As to paternal grandfather, Father does not allege any prejudice as a result of a lack of notice. As to paternal grandmother, Father's prejudice argument consists of one sentence: "Father

11

argues paternal grandmother could provide relevant evidence and testimony regarding the bond the child had with his father prior to incarceration and attempts [at] making contact while incarcerated." This statement is conclusory and does not convey enough information regarding the extent or significance of the potential testimony to permit an appellate court to evaluate whether the omission of this evidence was prejudicial to Father. See *In re Ch.W.*, 2016 WL 556385, at *8 ("Father does not point to any evidence which the children's grandparents would have presented which could have rebutted the State's case. He does not allege or explain how their presence would have affected the outcome of the proceedings. Thus, we conclude that the district court's failure to appropriately notify the children's grandparents of the termination hearing was not reversible error.").

For all these reasons, we decline to find the district court erred.

*Denial of Father's Motion for Continuance*

Father contends the district court abused its discretion by denying his motion for continuance made on the day of the scheduled termination hearing. According to Father, a continuance was necessary for him to obtain discovery regarding his prior criminal case and his divorce case. As a result, Father argues that he was not allowed the opportunity to present a full defense. Mother counters that Father presented no evidence supporting his claim and his "lack of preparedness is not an appropriate reason to continue a [termination hearing] when the very outcome of [the hearing] is critical for the minor's [wellbeing]."

At the January 11, 2019 pretrial hearing, Mother's counsel stated that the district court could take judicial notice of Father's prior criminal case and divorce proceedings in Johnson County. She then added, "I am happy to do all the necessary paperwork to have those files sent to this Court." A colloquy between the district court and counsel ensued

regarding the court files that both counsels wanted to obtain. After the hearing, the district court filed a journal entry ordering Mother's counsel to obtain copies of both the criminal and divorce court files in Johnson County.

Three months later, at the pretrial conference held on April 12, 2019, Mother's counsel informed the district court that she had provided certified copies of documents filed in the divorce and criminal cases to Father's counsel and the GAL. After the hearing, the district court filed a journal entry taking judicial notice of the certified copies provided by Mother's counsel.

Three months after the pretrial conference, Judge Smith was assigned to the case. At the termination hearing, Father objected to the proceedings and requested a continuance because he was not given the complete criminal and divorce records. Mother's counsel explained that she had previously provided certified copies of certain file documents in the criminal and divorce cases to Father's counsel. As she had previously explained to the court and counsel, however, these documents did not constitute the entire criminal and divorce case files.

In addition to Mother, both the GAL and counsel for the maternal grandparents argued against a continuance. Counsel for the maternal grandparents argued that if Father desired additional documents from the other court case files he should have obtained them previously.

The district court denied the motion for continuance, ruling that

"every party has their own responsibilities to obtain discovery, and that includes court records. And in this case, it appears that [Mother's counsel] acquired whatever records that she could have acquired, but a failure to acquire additional court records . . . does not rest on [Mother's counsel's] shoulders. It rests on the [F]ather's shoulders."

13

A district court's denial of a continuance is reviewed for abuse of discretion. *In re J.A.H.*, 285 Kan. 375, 384-85, 172 P.3d 1 (2007). A judicial action constitutes an abuse of discretion if (1) it is arbitrary, fanciful, or unreasonable; (2) it is based on an error of law; or (3) it is based on an error of fact. *Biglow v. Eidenberg*, 308 Kan. 873, 893, 424 P.3d 515 (2018). The party asserting the district court abused its discretion bears the burden of showing such abuse of discretion. *State v. Stafford*, 296 Kan. 25, 45 290 P.3d 562 (2012). Father does not assert the district court's action was an error of fact or law; therefore, we will consider whether the district court's action was arbitrary, fanciful, or unreasonable.

Father's primary complaint is that he only became aware on September 9, 2019, that the complete records of the prior criminal and divorce cases were not obtained by Mother's counsel. However, both judges assigned to this case—including the ordering judge—found Mother's discovery to be sufficient. When discussing the files, the initial presiding judge, Judge Richard A. Macias, stated that Mother's counsel "went to more than reasonable efforts" to obtain the relevant files. Judge Macias did not order Mother's counsel to obtain more records, nor did Father object to inclusion of only the relevant records rather than the complete criminal and divorce files. Similarly, Judge Smith held Mother's counsel tried to obtain records and any failure to obtain complete files was not the fault of Mother's counsel.

Moreover, Father knew Mother's counsel did not obtain the complete files at the pretrial conference in April 2019 because Mother's counsel identified what she did and did not obtain at the pretrial conference when Father was present. Mother's counsel also provided to Father's counsel the file documents she obtained. As a result, Father knew he did not have copies of the complete files during the five months leading up to the termination trial.

Father has also failed to show prejudice. He does not describe or identify the materials which he claims were necessary for his defense. A review of the criminal case

14

file records admitted in evidence reveals considerable information that is unfavorable to Father's case. Father has not favored us with the particular documents that would have been favorable to his defense. As noted earlier, at least one document filed in the divorce case supports Mother's case for parental termination. Yet, Father has not shown there were documents favorable to his legal position.

Father has failed to meet his burden of showing that the district court's denial of a continuance was arbitrary, fanciful, or unreasonable. The district court found Mother's counsel sufficiently complied with the discovery order and any need for additional discovery was not the fault of Mother's counsel. A district court is to dispose of CINC proceedings "without unnecessary delay." See K.S.A 2019 Supp. 38-2201(b)(4). Moreover, considering the expedited nature of CINC proceedings, it is not arbitrary, fanciful, or unreasonable for the district court to deny a continuance for additional discovery when Father had five months to obtain other materials. We find no error.

*Denial of Father's Request for New Counsel*

In his pro se appellate brief, Father argues the district court abused its discretion when it denied his request for new counsel during the termination trial.

Father requested appointed counsel on December 26, 2018. The motion was granted, and Michelle Smith was appointed to represent Father. A few months later, Father filed a motion for new counsel asserting that Smith was not staying in contact with him or conducting a necessary investigation. Less than two months later, Father filed another motion to replace Smith, citing similar grounds. This motion was granted by the district court on May 30, 2019, and the district court appointed Gerard C. Scott to represent Father.

15

Shortly before trial, Scott filed multiple motions, including a motion for an independent psychological evaluation of R.J., a motion requesting R.J.'s medical records, a motion requesting Kansas Department for Children and Families (DCF) records, and a motion for continuance of the termination hearing.

The motion for continuance stated four grounds in support. First, that since his appointment, Scott was involved in a murder trial, had other matters to attend to and was planning a vacation in July. Second, that Father was pursuing posttrial remedies to obtain an earlier release from incarceration. Third, that a DCF investigation had been opened and additional time was needed to discover the basis for the investigation. Fourth, that counsel needed additional time to investigate the various claims and that it was in the best interests of R.J. that Father's rights were not terminated without a more thorough investigation.

The district court held a hearing on the motions on August 30, 2019. It granted Father's motions requesting medical and DCF records but denied the request for a psychological evaluation of R.J. The district court also denied Father's motion for a continuance noting that the case was filed in 2018 and "the parties appear to be prepared and ready to proceed to trial but for the motions we just heard."

On the day of the termination hearing, after counsel had waived opening statements, Father interrupted the hearing to ask if he could request new counsel. The district court overruled the request, and Mother began presentation of her case in chief. After Mother rested her case, Scott asked the court to "be given an opportunity—[Father] had made an oral motion to have me discharged as his lawyer, and I think he ought to be given an opportunity just to make a record on whatever he feels his complaints are in that regard." The district court agreed.

16

Father referenced Scott's earlier motion for a continuance indicating the attorney needed additional time to investigate the case. Father complained that Scott failed to investigate Father's "strongest defense" which was "that my criminal case will be reversed here one day, hopefully sooner than later." Father protested that Scott did not prepare a trial brief which was going to highlight Father's on-going postconviction litigation to reverse his two solicitation to commit murder in the first-degree convictions. He also asserted that Scott did not want to review or investigate Moore's role as R.J.'s GAL in the prior divorce proceedings in Johnson County.

The district court overruled Father's motion, noting that Father's convictions had been upheld on appeal and, in this regard, he did not see that Scott had performed inappropriately. The district court observed that Scott was "very effective in his cross-examination of Ms. Meek." The district court also suggested that some of the issues that Father wanted to raise in his recently prepared counter-petition comprised allegations against Mother for which "we have absolutely nothing to indicate that there is any support for those allegations." The district judge concluded that, "based on what I've seen up to this point, I do not see anything that would indicate that Mr. Scott has done anything but zealously represent you in this case."

Father's claim of error suffers from several infirmities. Supreme Court Rule 6.02(a)(5) (2020 Kan. S. Ct. R. 35) requires that an appellant's brief contain "[t]he arguments and *authorities* relied on." (Emphasis added.) Father mentions two cases neither of which are on-point precedent in support of his claim of error. More importantly, Father has not cited the proper legal standard upon which an appellate court should review an ineffective assistance of counsel claim in CINC cases or discussed the application of that standard to the facts of this case. Failure to support a point with pertinent authority is akin to failing to brief the issue. *In re Adoption of T.M.M.H.*, 307 Kan. at 912. "[A]n argument that is not supported with pertinent authority is deemed

17

waived and abandoned. [Citations omitted.]" *Friedman v. Kansas State Bd. of Healing Arts*, 296 Kan. 636, 645, 294 P.3d 287 (2013).

Father's argument for ineffectiveness on appeal is at variance with his assertions made in the district court. While Father has listed numerous claims of ineffectiveness in his brief, as set forth earlier, he mentioned only four areas of concern in the district court. Those four claims do not establish ineffectiveness. First, while Father maintains his strongest defense was his expectation that his convictions will be reversed, as the district court noted, those convictions were upheld on appeal and there is no assurance that any post-conviction relief will result in Father's freedom in the near term. Father has failed to show how anything Scott did or omitted to do could have changed this reality.

Second, Father has not shown that any testimony or materials by Moore would have been beneficial to Father. On the contrary, as mentioned earlier, evidence was admitted that Moore filed a pleading in Johnson County District Court seeking to terminate Father's rights to visitation with R.J. in the divorce proceeding based on his arrest for soliciting Mother's murder.

Third, Scott's routine request for a continuance due to the press of business and vacation does not prove that he was necessarily unprepared or ineffective at the time of the termination hearing. It is well settled that "[o]n appeal, error below is never presumed and the burden is on the appellant to make it affirmatively appear." *First National Bank & Trust Co. v. Lygrisse*, 231 Kan. 595, Syl. ¶ 8, 647 P.2d 1268 (1982). This, Father has failed to do.

Finally,

"in order to prevail on a claim of ineffective assistance of counsel, the party alleging ineffective assistance must establish that the performance of counsel was deficient, and

18

the party was prejudiced by the ineffective assistance. This means that there is a reasonable probability a different result would have been achieved in the absence of the deficient performance. See *State v. Sprague*, 303 Kan. 418, 426, 362 P.3d 828 (2015); *Sola-Morales v. State*, 300 Kan. 875, 882, 335 P.3d 1162 (2014)." *In re D.H., Jr.*, 54 Kan. App. 2d. 486, 498, 401 P.3d 163 (2017).

As discussed in the later section entitled, "Sufficiency of Evidence in Termination of Father's Parental Rights," we have found substantial clear and convincing evidence to support the district court's decision to order termination of Father's parental rights. Assuming the ineffectiveness that Father asserts—which Father has not shown—we are not persuaded there is a reasonable probability a different result would have been achieved given the substance and quality of the evidence of Father's unfitness. We find no error.

*District Court's Errors in Making Findings.*

Father contends the district court made inaccurate and insufficient findings regarding its ruling that R.J. is a child in need of care. He also argues the district court "created an erroneous conflict and ambiguous record" because the district court's oral pronouncement of its ruling differed from the journal entry filed at the conclusion of the case.

Preliminarily, once again, Father did not object to the impropriety of any of the district court's oral or written findings in the district court. Instead, he is raising this argument for the first time on appeal. See *Wolfe Electric*, 293 Kan. at 403. And, as before, Father does not assert an exception to the general rule against raising issues for the first time on appeal in compliance with Supreme Court Rule 6.02(a)(5). We will not repeat our discussion of Kansas law regarding the importance of preserving issues for appellate review which we addressed in the section pertaining to Father's claim of a due

process violation. Suffice it to say that because the issue was not preserved for appellate review it is waived or abandoned.

In the interest of completeness, however, we make three observations. First, regarding Father's complaint that the district court's oral and written findings were inconsistent, our court has found "[i]n a civil action, a district court's journal entry of judgment controls over a prior oral pronouncement from the bench." *Steed v. McPherson Area Solid Waste Utility*, 43 Kan. App. 2d 75, 87, 221 P.3d 1157 (2010); see *In re I.G.*, No. 122,009, 2020 WL 2296918, at *2 (Kan. App. 2020) (unpublished opinion) (applying rule to termination proceedings where district court made oral findings different than those in the journal entry). Assuming Father's claim of inconsistency is valid, the journal entry controls.

Second, not only did Father not object to the oral findings or journal entry, Father's counsel approved and signed the journal entry. When no objection is made to a district court's findings of fact or conclusions of law based on inadequacy, an appellate court may presume the district court found all facts necessary to support its judgment. *State v. Jones*, 306 Kan. 948, 959, 398 P.3d 856 (2017).

Third, we have reviewed the district court's oral and written factual findings and find them sufficient to support the court's legal conclusions. For all these reasons, we decline to find the district court erred.

SUFFICIENCY OF EVIDENCE IN TERMINATION OF FATHER'S PARENTAL RIGHTS

Father contends the district court abused its discretion in terminating his parental rights because there was insufficient evidence to support the judgment. Mother counters that there was clear and convincing evidence in support of the district court's decision.

20

We begin the analysis with a brief summary of our standards of review and Kansas law relating to termination of parental rights. A parent has a constitutionally protected liberty interest in the relationship with his or her child. See *Santosky v. Kramer*, 455 U.S. 745, 753, 758-59, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982); *In re B.D.-Y.*, 286 Kan. 686, 697-98, 187 P.3d 594 (2008). Given the inherent importance and unique character of that relationship, the parental right has been deemed fundamental. *Santosky*, 455 U.S. at 753. Accordingly, the State may extinguish the legal bonds between parent and child only upon clear and convincing proof of parental unfitness. K.S.A. 2019 Supp. 38-2269(a); *In re R.S.*, 50 Kan. App. 2d 1105, Syl. ¶ 1, 336 P.3d 903 (2014).

As provided in K.S.A. 2019 Supp. 38-2269(a), the State must prove the parent is unfit "by reason of conduct or condition" making the parent "unable to care properly for a child" and that the circumstances are "unlikely to change in the foreseeable future." The statute contains a nonexclusive list of nine conditions that singularly or in combination constitute unfitness. K.S.A. 2019 Supp. 38-2269(b). If a parent no longer has physical custody of a child, the statute lists four other factors to be considered K.S.A. 2019 Supp. 38-2269(c).

In reviewing a district court's determination of unfitness, an appellate court must be convinced, based on the full evidentiary record considered in a light favoring the State as the prevailing party, that a rational fact-finder could have found that decision "highly probable, *i.e.*, [supported] by clear and convincing evidence." *In re B.D.-Y.,* 286 Kan. at 705. The appellate court may not weigh conflicting evidence, pass on the credibility of witnesses, or otherwise independently decide disputed questions of fact. 286 Kan. at 705.

In considering the foreseeable future, courts should use "child time" as the proper measure. The KCCC, as set forth in K.S.A. 2019 Supp. 38-2201 et seq., recognizes, children experience the passage of time in a way that makes a month or a year seem considerably longer than it would for an adult and that different perception typically

points toward a prompt, permanent disposition. K.S.A. 2019 Supp. 38-2201(b)(4); *In re M.B.*, 39 Kan. App. 2d 31, 45, 176 P.3d 977 (2008); *In re G.A.Y.*, No. 109,605, 2013 WL 5507639, at *1 (Kan. App. 2013) (unpublished opinion) ("'child time'" differs from "'adult time'" in care proceedings "in the sense that a year . . . reflects a much longer portion of a minor's life than an adult's").

The district court found Father was unfit to parent R.J. under six separate subsections of K.S.A. 2019 Supp. 38-2269. On appeal, Father analyzes some factors separately and others in groups. As a result, we will analyze the evidence underlying the factors in a similar manner.

*K.S.A. 2019 Supp. 38-2269(b)(4)*

Under K.S.A. 2019 Supp. 38-2269(b)(4), a district court may terminate parental rights when clear and convincing evidence shows "physical, mental or emotional" abuse or neglect or sexual abuse of a child. K.S.A. 2019 Supp. 38-2202(y) defines "'[p]hysical, mental or emotional abuse'" as "the infliction of physical, mental or emotional harm or the causing of a deterioration of a child and may include, but shall not be limited to, maltreatment or exploiting a child to the extent that the child's health or emotional well-being is endangered."

At the termination hearing, the district court found, "Simply stated, [Father's] act of soliciting someone to murder the mother has inflicted severe psychological abuse upon the child." But on appeal, Father contends there was no "direct connection with [F]ather's 'convictions and incarceration' to any past or present mental or emotional abuse." In support, Father argues the definition of "'[p]hysical, mental, or emotional abuse' . . . requires a two-prong analysis:  infliction of physical, mental or emotional abuse and the deterioration of the child." See K.S.A. 2019 Supp. 38-2202(y) This interpretation of the statute is mistaken.

22

The plain language of K.S.A. 2019 Supp. 38-2202(y) reads that such abuse is "the infliction of physical, mental, or emotional of harm *or* the causing of a deterioration of a child." (Emphasis added.) As a result, Mother only needed to present testimony of either the infliction of harm or the deterioration of R.J. to meet the definition of "'[p]hysical, mental or emotional abuse.'" See K.S.A. 2019 Supp. 38-2202(y). Still, the evidence in this case supported both types of abuse.

At the trial, Mother presented the testimony of Meek, a licensed therapist who had been counseling R.J. since July 2018. Meek testified that she was currently licensed in Kansas as a clinical marriage and family therapist and as a supervisor of play therapy. Meek graduated from Friends University with a bachelor's degree in psychology and subsequently obtained a graduate degree in marriage and family therapy from the university. She testified that she worked for DCCCA (Douglas County Citizens Committee on Alcoholism, Inc.) for five years as a family therapist before employment as a therapist with First Step Counseling from 2001 until 2008. According to Meek, since 2008 she has been in private practice. Meek estimated that 65% of her caseload involved counseling children and adolescents. Over Father's objection, Meek was qualified as an expert witness.

Meek testified that since July 12, 2018, she had conducted 13 counseling sessions with R.J. She testified at length regarding the mental and emotional harm R.J. has suffered since Father committed the acts that led to his convictions. Meek testified R.J. presented issues of "significant anxiety, difficulty with self-regulation, calming himself, and distrust of others" when he started counseling with her. Meek testified R.J. could become "triggered or anxious" and when he did, "[h]e couldn't manage stress well or cope well. [His] fight-or-flight responses were just very significant."

Meek explained that R.J. "just does not trust" and "has a hard time with peer relationships [and] [h]e is looking for the next bad thing to happen." Meek testified that

23

R.J. is "very smart, very insightful, and educated" but socially, R.J. is "very isolated, you know, kind of held back."

Specifically, Meek testified regarding R.J.'s feelings about Father. Meek stated R.J. "becomes significantly more anxious, more fearful" when discussing or describing his father. "He just has a fear of him coming back and what that might look like or . . . I think it's a fear of, you know, will he—you know, will his mother be hurt or will his mother be safe, will he be safe, what will that look like, and there's just a significant anxiety around that." Moreover, Meek testified that R.J.

> "is quite adamant on just not having a desire to have any kind of contact at all [with Father]. He's quite clear about that. And he gets intense when he has those discussions. It's very difficult for him to talk about those things. He is very upset, and he just becomes so fearful."

Meek opined that the trauma Mother and R.J. suffered together created a "traumatic attachment" that makes R.J. more anxious. R.J. has "difficulty with trusting others because it was a perpetrator within his foundations versus maybe an outside perpetrator makes it more difficult for him." Meek opined that the actions of Father were "psychologically abusive" to R.J. because he has reported remembering "inappropriate domestic violence-type situations" from when he was very young and he remains anxious and fearful. Of note, Meek testified that R.J. refers to Father as "'the monster.'"

Meek further testified that R.J. is "distrustful" and "does not feel safe" with men. This was also evidenced by Meek's notes from a counseling session with R.J., which were admitted in evidence. Meek opined that these fears are signs of "psychological abuse" as a result of the "significant amount of trauma just from what [R.J.] has been through." Moreover, Meek testified that R.J. is "aware" Father is imprisoned and knows Father "[c]an't get to him," and "[e]ven with that knowledge, he is terrified of resuming a

24

relationship with his father." Meek testified R.J. needs Father's parental rights terminated to protect R.J. from having to resume a relationship with Father, which she described as the "worst thing that could happen for [R.J.]."

Quite simply, the record shows Father inflicted mental, or emotional harm upon R.J. due to domestic violence incidents when R.J. was younger and culminating with Father's attempts to murder his ex-wife—R.J.'s mother. Meek's expert testimony shows Father's behavior and criminal conduct have caused R.J. severe and on-going psychological harm. Moreover, the evidence was clear and convincing that the harms to R.J. not only were longstanding, but they would continue into the foreseeable future. In summary, clear and convincing evidence supported the district court's decision to terminate Father's parental rights under K.S.A. 2019 Supp. 38-2269(b)(4).

*K.S.A. 2019 Supp. 38-2269(b)(5), and (c)(2)*

Under K.S.A. 2019 Supp. 38-2269(b)(5), a district court may terminate parental rights when there exists clear and convincing evidence of a "conviction of a felony and imprisonment." And under K.S.A. 2019 Supp. 38-2269(c)(2), a district court may terminate parental rights "when a child is not in the physical custody of a parent" and there was a "failure to maintain regular visitation, contact or communication with the child or the custodian of the child."

On appeal, Father candidly concedes, "that the [indisputable] single fact of his felony convictions and his current incarceration . . . is sufficient to find [he] is present[ly] unfit and without a sentence reduction the unfitness is unlikely to change in the foreseeable future." Still, Father asserts that under Kansas caselaw, "incarceration, standing alone, is not sufficient to terminate a parent's parental rights." Father has mistakenly conflated Kansas caselaw.

25

Regarding K.S.A. 2019 Supp. 38-2269(b)(5), the uncontroverted evidence shows that Father was convicted of two felony counts of solicitation to commit murder in the first degree of R.J.'s mother. He was sentenced to a controlling term of 132 months in prison. Under these circumstances, the Kansas statute and caselaw is clear:

> "In fact, under Kansas law, simply committing a felony and being imprisoned can constitute the sole basis for a finding of unfitness, regardless of the circumstances of the crime. K.S.A. 2013 Supp. 38-2269(b)(5), (f); see *In re M.D.S.*, 16 Kan. App. 2d 505, Syl. ¶ 4, 825 P.2d 1155 (1992). The termination-of-parental-rights statute refers only to felonies generally and doesn't require the crime to be related to parenting to terminate a parent's rights under this basis. K.S.A.2013 Supp. 38-2269(b)(5), (f)." *In re M.H.*, 50 Kan. App. 2d 1162, 1172-73, 337 P.3d 711 (2014).

Based on K.S.A. 2019 Supp. 38-2269(b)(5) and given Father's lengthy prison sentence for commission of two serious felony offenses, the district court did not err in finding clear and convincing evidence that Father was unfit to parent R.J. now and in the foreseeable future.

Under K.S.A. 2019 Supp. 38-2269(c)(2), and with regard to incarceration generally—as distinguished from a parent who is incarcerated for a *felony conviction*—Father attributes his failure to maintain regular visitation, contact or communication with R.J. to the district judge in his divorce case who issued an order suspending and prohibiting any contact between himself and his child.

In discussing the issue of an incarcerated parent generally, our court has stated:

> "[E]ven though Father is correct that incarceration *may* be considered a mitigating factor, it's up to the district court how to consider a person's incarceration within the facts of the case. *In re M.D.S.*, 16 Kan. App. 2d at 509-11, 825 P.2d 1155. In some cases, incarceration might be cause to excuse a parent's failure to complete certain tasks toward reuniting with a child. In other cases, incarceration may be considered a significant negative factor, such as where it has impeded the development of a relationship between

26

the parent and the child, where the parent has been incarcerated for the majority of the child's life and the child spent the time in the State's custody, and where the incarceration would cause further delay in the proceedings that isn't in the child's best interests. 16 Kan. App. 2d at 509-11, 825 P.2d 1155." *In re M.H.*, 50 Kan. App. 2d at 1172.

Here, the district court appropriately considered Father's incarceration as a negative factor. Father has not been in contact with R.J. since he was incarcerated in 2012—9 out of the 14 years R.J. has been alive. As mentioned earlier, Father's incarceration has adversely impacted his relationship with R.J. and his absence has caused R.J. considerable emotional harm. Meek testified that Father's absence "created this difficulty of who does [R.J.] trust by not having that parental figure around." Meek testified this absence creates uncertainty for R.J., which leads to "more anxiety." And when asked what impact a parent's extended absence would have on a child, Meek opined:

> "For [R.J.], he knows why his dad is not with him. For him, you know, there's this—more of a fear based off, you know, not wanting his dad to be with him, but then also not, you know, feeling protected and feeling vulnerable and feeling like a person [who] is supposed to protect you also is one [who] violated that kind of safety."

It is understatement that Father knew his efforts to arrange the murder of R.J.'s mother, if detected, could result in significant imprisonment. As a result, Father's lengthy incarceration and inability to parent R.J. was foreseeable given his criminal behavior. His illegal conduct directly precipitated the lengthy incarceration which resulted in adverse psychological and emotional damage to R.J. Regardless of the no contact order, Father's criminal conduct resulted in an extended period of incarceration which, by its duration and given R.J.'s age, precludes any purposeful regular visitation, contacts, or communication with R.J.

27

We are convinced that clear and convincing evidence supported the district court's determination that Father was unfit now and in the foreseeable future to parent R.J. under both K.S.A. 2019 Supp. 38-2269(b)(5) and (c)(2).

*K.S.A. 2019 Supp. 38-2269(b)(7) and (c)(3)*

Under K.S.A. 2019 Supp. 38-2269(b)(7), a district court may terminate parental rights when clear and convincing evidence establishes a "failure of reasonable efforts made by appropriate public or private agencies to rehabilitate the family." And under K.S.A. 2019 Supp. 38-2269(c)(3) a district court may terminate parental rights if the child is not in the physical custody of a parent and when clear and convincing evidence of a "failure to carry out a reasonable plan approved by the court directed toward the integration of the child into a parental home."

Father contends the record contains "no evidence to support these findings." We agree. Under the unique circumstances of this case, there were no "reasonable efforts" made by any public or private agency to rehabilitate R.J. and Father's relationship. K.S.A. 2019 Supp. 38-2269(b)(7). The district court also never approved a plan designed to reintegrate R.J. into Father's home. K.S.A. 2019 Supp. 38-2269(c)(3). Clear and convincing evidence does not support the district court's findings that Father is unfit to parent R.J. under K.S.A. 2019 Supp. 38-2269(b)(7) and (c)(3).

*K.S.A. 2019 Supp. 38-2269(b)(8)*

Under K.S.A. 2019 Supp. 38-2269(b)(8), a district court may terminate parental rights when there is clear and convincing evidence of a "lack of effort on the part of the parent to adjust the parent's circumstances, conduct or conditions to meet the needs of the child." Father contends that "[w]ithout court orders and permanency plans [F]ather did not have any opportunity to make any effort 'to adjust his circumstances.'"

28

Similar to the analysis of K.S.A. 2019 Supp. 38-2269(b)(7) and (c) (3), we are persuaded that, in part, due to the nature of Father's convictions and institutional constraints imposed by his lengthy incarceration, there was insufficient clear and convincing evidence that this factor warranted a finding of unfitness.

*Summary of Relevant Factors*

We have concluded that three statutory factors justify the district court's finding that Father is presently and in the foreseeable future unfit to parent R.J. Of course, any one of the factors in K.S.A. 2019 Supp. 38-2269(b) or (c) may, but does not necessarily, establish grounds for termination of parental rights. See K.S.A. 2019 Supp. 38-2269(f).

Two of the factors merit special mention due to their importance. As to K.S.A. 2019 Supp. 38-2269(b)(4), Meek's expert testimony established that Father's solicitations to commit first-degree murder of R.J.'s mother resulted in the son sustaining severe psychological and emotional damage now and in the foreseeable future. Regarding K.S.A. 2019 Supp. 38-2269(b)(5), the undisputed evidence proved that Father was incarcerated due to his commission of the two felonies of solicitation to commit murder in the first degree. Considered individually or collectively, these two factors were especially important in validating the district court's legal conclusion that Father was unfit to parent R.J. now or in the foreseeable future.

THE BEST INTERESTS OF R.J.

Father contends the district court abused its discretion in finding that the termination of Father's parental rights is in the best interests of R.J. According to Father, it was not in R.J.'s best interests "to 'legally bastardize' his son." See *Bariuan v. Bariuan*, 186 Kan. 605, 609, 352 P.2d 29 (1960). Mother contends overwhelming evidence

29

supports the district court's finding that it was in R.J.'s best interests to terminate Father's parental rights.

Upon a finding of parental unfitness, the district court must determine whether termination of parental rights is "in the best interests of the child." K.S.A. 2019 Supp. 38-2269(g)(1). As directed by the language of K.S.A. 2019 Supp. 38-2269(g)(1), the district court gives "primary consideration to the physical, mental and emotional health of the child." The district court makes that determination based on a preponderance of the evidence. See *In re R.S.*, 50 Kan. App. 2d at 1115-16. The assessment of the child's best interests is entrusted to the district court acting within its sound judicial discretion. 50 Kan. App. 2d at 1115-16.

As an appellate court, we review the decision regarding a child's best interests for abuse of discretion. A district court exceeds that broad latitude if it rules in a way no reasonable judicial officer would under the circumstances, if it ignores controlling facts or relies on unproven factual representations, or if it acts outside the legal framework appropriate to the issue. See *Northern Natural Gas Co. v. ONEOK Field Services Co.*, 296 Kan. 906, 935, 296 P.3d 1106 (2013); *State v. Ward*, 292 Kan. 541, Syl. ¶ 3, 256 P.3d 801 (2011). Of note, Father does not assert the district court made an error of fact or law so we will consider if the district court ruled in a way that no reasonable judicial officer would, given the circumstances of this case.

Meek testified that termination of Father's parental rights would be in R.J.'s best interests. In addition to Meek's testimony about R.J.'s struggles with anxiety and fear towards Father, Meek testified at length as to R.J.'s need for stability:

> "[R.J.] desires to feel in control of his surroundings, and I think there's a fear of in the
> future will he feel like a sense of control, you know, or what will that—it's kind of like an
> uncertainty. And so I think he's fearful regarding that, what does the future look like."

30

As evidenced by Meek's clinical notes, R.J. "'feels that once things are more finalized with Father, he will feel more secure. . . .'" Meek clarified that R.J.'s vision of "finalized" is not having contact with Father and R.J. believes he will improve "once Father is completely out of his life legally and in every other possibility." "[H]e needs that sort of finality of no possibility of Father reentering his life to make improvement." Meek added that "[R.J.] is worried that somehow—like what will that mean? Will my father, you know, come back? Will I have to do visits? I think there's a lot of uncertainty for [R.J.] in what that looks like."

Together with R.J.'s need for stability, Meek testified that for R.J. to have contact with Father, "he would probably have to be medicated." She added:

> "I believe that he would have such a hard time with dysregulation if he thought that he was going to have any kind of contact with [Father] at all. [R.J.] has a hard enough time just managing himself, but if he thought that he was going to have like a visit with his father—I mean, I understand that there [are] typically goals that you work toward with reintegration, and I support families working together, but [R.J.] has such a difficult time with anxiety and past trauma and the neurological struggles that he has, I don't know that [R.J.] has the capacity to be able to do so."

Meek clarified that she would need "at least two more years to work with [R.J.] to be able to even assess [him] before even talking about visitation." And when considering whether it would be in R.J.'s best interests to have contact with Father, Meek opined:

> "I have worked a lot of reintegration and it really depends on the child and their flexibility emotionally. [R.J.] truly struggles. [R.J.]—he struggles so much with anxiety and self-regulation. He struggles with flexibility, with coping. He has so many things that he has to work on individually. So to do visits, we would be—whose needs are we serving? Are we serving [Father's] needs? Are we serving [R.J.'s] needs at this point?"

31

In giving primary consideration to the physical, mental, and emotional health of R.J., Father has not shown that no reasonable judicial officer would have found termination to be in R.J.'s best interests. As a result, the district court did not abuse its discretion in finding it was in R.J.'s best interests to terminate Father's parental rights.

Finally, in his pro se appellate brief, Father claims that the district court's cumulative errors require reversal of the court's rulings and judgment. We disagree. Whether Father's claims of error are considered singularly or cumulatively we find no basis to reverse the district court's rulings or judgment.

Affirmed.