NOT DESIGNATED FOR PUBLICATION

No. 123,760

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Matter of the Marriage of
EARNEST E. GREEN II,
*Appellee*,

and

LANA J. GREEN,
*Appellant*.


MEMORANDUM OPINION

Appeal from Leavenworth District Court; DAN K. WILEY, judge. Opinion filed November 12, 2021. Affirmed in part, reversed in part, and remanded with directions.

*J. Steven Schweiker*, of Overland Park, for appellant.

*Stanley R. McAfee*, of Kansas City, for appellee.

Before BRUNS, P.J., HURST, J., and MCANANY, S.J.

PER CURIAM: Lana J. Green appeals from the district court's decision dividing property in this divorce action. On appeal, Lana contends that the district court abused its discretion when it concluded that her former husband, Earnest E. Green II, did not dissipate assets during their one-year marriage. Second, she contends that the district court abused its discretion in dividing the marital property. Third, she contends that the district court erred by refusing to grant her attorney fees arising out of a successful motion to compel.

1

Based on our review of the record, we find that the district court appropriately exercised its discretion in dividing the parties' assets. However, we find that given the mandatory language of K.S.A. 2020 Supp. 60-237(a)(5), the district court was required to either award reasonable attorney fees to Lana arising out of her successful motion to compel or conclude that one of the statutory exceptions applied. Thus, we affirm in part, reverse in part, and remand the issue of attorney fees to the district court for further proceedings.

FACTS

In May 2018, Lana J. Green—who was then 69 years old—began dating Earnest Green—who was then 68 years old. After briefly living together in Earnest's house, the couple were married on November 15, 2018. Unfortunately, the marriage only lasted about one year before Earnest filed a petition for divorce.

In the approximately six months between the commencement of their relationship until they got married, Earnest and Lana opened a joint bank account. They began depositing their paychecks and social security checks into the joint account. They also paid bills out of the joint account. After getting married, Lana sold her house and deposited $77,414.20 from the sale into the account. Lana also liquidated her retirement account and deposited another $39,647.50 into the account. In addition to the parties' joint account, Earnest maintained a bank account for his business—GPS Sales—to which Lana did not have access. During the marriage, Earnest made at least two transfers between his business account and the joint account.

Earnest also had an American Express account and made several transfers between this account and the joint account during the marriage—including at least one as large as $25,000. Although Lana testified that she had no access to the American Express account, Earnest testified that he gave Lana the password so she could view any

2

transactions. He also testified that the large transfer was a joint decision made by the parties so that they could earn more interest. Lana testified that Earnest also wrote a significant number of checks to cash during their marriage, estimating the total amount to be $21,827.70.

During their short marriage, Earnest and Lana jointly made several large purchases together. These purchases included a vacation house in Florida for $58,425. After purchasing furniture and making improvements, the couple incurred about $82,000 in expenses related to the Florida house and the purchase of a golf cart. In addition, they purchased a hot tub for their Kansas residence for around $17,400.

Shortly before filing for divorce, Earnest and Lana sold the Florida house and furniture for $85,000. Lana retained the net proceeds from the sale. In addition, Lana also retained $6,500 from the sale of the golf cart. Earnest transferred around $10,000 from the couple's joint account to a new personal account. He testified that he did so to restore the funds he had in his personal account before the marriage.

After completion of discovery in the divorce action, the district court held a bench trial at which both Earnest and Lana testified. In addition, 64 exhibits—including nearly 400 pages in bank records, receipts, and spreadsheets—were admitted into evidence. Following the trial, the district court held another hearing at which it granted Earnest and Lana a divorce. At the hearing, the district court also announced its findings and conclusions regarding the division of the parties' assets and liabilities.

The district court determined that Earnest did not dissipate the parties' assets. The district court also concluded that neither party had taken advantage of the other during their one-year marriage. Instead, the district court determined that the parties had made significant decisions about their expenditures based on their chosen lifestyle during the

3

marriage. Ultimately, the district court ordered Earnest to pay Lana $12,000 in order to make an equitable division of the parties' property.

The district court explained its decision on the record:

"[T]he Court is required to divide the issues before the Court. This is pursuant to K.S.A. 23-2802. The Court uses the date of valuation to be the date of filing in this case. A division of property is to be just and reasonable under the circumstances. It's to be an equitable division and not necessarily an equal division. There are statutory factors set forth in the statute including the age of parties; the duration of the marriage; the property owned; their present and future earning capacity; the time, source and manner of acquisition; family ties or obligations; the allowance of maintenance or lack thereof; any assertion of dissipation of assets; and the tax consequences of the property division upon the respective economic circumstances of the parties.

"Frankly, these . . . cases are the hardest cases for the Court. The Court has a tendency, when I deal with assets, to make an equal division. You add up the assets, you subtract the debts, and then you divide the property, and you tend to try to do it in an equal fashion. This case is impossible to do that, in the Court's opinion. And, really, it makes it tough on deciding what is equitable or what is fair from the parties because they brought certain different economic amounts into the marriage and are taken out of the marriage.

"And to kind of go through those briefly with regard to those contributions. There was a—an account, on November the 15th, that was the joint account that had $1266 in that account. Then in this joint account, there were certain deposits made, first by the respondent, and those deposits totaled a 120,414, at least the ones the Court considered to be premarital or non-marital. This included a $4,000 deposit on December the 5th from [an] account that she had, a separate account. A $38,000 deposit on the January the 5th, this was for her deposit from cashing in an IRA. She cashed in about $50,000 worth of an IRA or—and after taxes of approximately 12,000, this left the balance of 38,000. It was actually was a little over 39,000. And from that, then, there was an additional deposit of a thousand dollars made on March the 7th that the Court

4

considered that to be funds leftover from the distribution of IRA that initially went to her premarital account. She also made a deposit of $77,414 and change on May the 28th. So those funds the Court considered to be non-marital, and that was $120,414.

"The petitioner started—had—when the account started was $1266 and 66—60 cents. And then through the course of the short-term marriage, there were transfers and transactions from the American Express account. Every transaction from the American Express account was either a transfer in or a transfer out of the joint account. And that account started on November the 18th with $10,144. And so when I add those two numbers up of premarital funds brought in, the petitioner brought in $11,411.

"Now, of course, the problem is the parties buy this property in Florida. Certainly, I think, ill-advised, and obviously if they knew the marriage wasn't gonna last long, doubt that they would've done it. Both parties tried to attribute some responsibility to the other parties for this property, and the Court doesn't think that really is persuasive to the Court at all. The reality is we bought this property, we sunk a lot of money into the property and the furniture, and then we turn around and sold the money at significant--or sold the property at significant loss. Likewise, we bought a golf cart, because that's the standard mode of transportation in this housing development or division, and then we sold the golf cart at a loss.

"And so when we arrive at November of 2019, this property is sold, and there's a total of $46,338 received from the property and the golf cart by the respondent. This includes 39,838 from the sale of the Florida property and $6500 from the golf cart, and these funds were provided to the respondent by the petitioner.

"The petitioner then took $10,000 from the parties' joint account and transferred that to the American Express, essentially under the theory that that's what he started the account with at the American Express. An—and so the Court finds that in November of 2019, basically at the time of filing the divorce, in this American Express account there is now $15,055. And there's also $2247 in the joint account that the petitioner transferred into a new account that was reflected in Petitioner's Exhibit 2. And so the Court, from that, finds that the petitioner has $17,302 from that joint account and the American

5

Express account, and the respondent has, essentially, $46,338 from the sale of the Florida property and the golf cart.

"But of course the analysis doesn't stop, and it's not a question of who has more money. It's a question of what did they contribute, premarital funds, and what did they receive back. Now, the petitioner . . . makes the point at trial . . . [that] during the marriage the petitioner contributed more funds to this joint account through employment, but the Court normally doesn't factor that in. That's true in all cases that the parties when they're married and have different earning powers and contribute differently to most marriages, and the Court doesn't keep a running tally of who contributed marital funds from working during a marriage to . . . a marital account. It's all part of the marriage. And the Court does track premarital funds, generally.

"There [were] also some things that both parties benefited from the joint account. There was a payoff of the wedding rings that are in the possession of the respondent. The respondent also had a car of approximately $1200 I understand was paid off. So those two debts were paid off. There [were] some credit cards the petitioner brought into the marriage, not a significant amount, but they were also paid off, and I think most of those were paid off primarily to finance the 40,000 on the Florida property.

"So when I get to the end, I go back to the numbers I looked at and that's the premarital assets contributed by the respondent's 120,414. The premarital assets contributed by the petitioner: 11,411. In order to, I think, make [an] equitable division, the parties should receive back a similar amount, percentagewise, of their investment. Now, it can't be 100 percent. We don't have those kinds of funds. And so one of the things that also, I guess, bothered me to some extent was that the petitioner received back the $10,000 from his original account, but—but, you know, other than the sale of the Florida property, the respondent didn't receive back the cash that she contributed to this account. And I don't think there was anything sinister [in] that. I think, in petitioner's eyes, he thought that was fair because she was receiving the funds from the sale of the Florida property. Let me be clear, I don't think there was any dissipation of assets, stealing of funds, hiding of funds from cash. I think that was a lifestyle that we lived.

6

"But, ultimately, what the Court finds, in order to return the parties to a percentage that I think is fair, the Court is going to grant the respondent a judgement in the amount of $12,000 against petitioner. And the reason the Court is doing this is at $12,000, the ultimate return to the petitioner, if I add that to the 46,338, is 58,338; just $12,000 more. That represents 48 percent of her original $120,414. If I deduct 12,000 from the 17,302 that the petitioner took at the end of the marriage, I come up with 5,302, and that represents 46 percent of his original investment of 11,411 that—that was premarital funds brought into the marriage.

"Now, to be fair, I think there's a lot of different ways a judge could look at this. I think there's significant latitude on what would be fair as far as a division of property. Not lost on the Court—by the way, I am going to assign the hot tub to the petitioner. Not lost on the Court is that there [were] some benefits received from both parties from the payoff of certain items, and the petitioner—or, excuse me, the respondent may have received a slightly more significant benefit by virtue of the wedding rings being paid off and retaining the wedding rings.

"But, ultimately, the Court, in this division, thinks that that is equitable. I can't return the parties and restore them to 100 percent of what they were before. I don't think that would be fair. I don't think that would be equitable. I think the parties made joint decisions. These parties are both sophisticated and of an age that they have the ability to make joint decisions, so I don't think I attribute whether the decisions were good or bad to one side or the other.

"Lastly, there was an issue of a request for attorney's fees on the Motion To Compel, and the Court considered this at length. And when I look at the overall documents in this case, when I look at the transactions that occurred, I don't see anything that causes the Court, I think, tremendous concern. Again, I don't think there was any dissipation of assets. I don't think anybody took advantage, per se, of anybody else. An— and if I did grant attorney's fees, I'd likely make a different order with regard to the amount that I've granted as a judgment. And so, ultimately, the Court is going to decline the request to award attorney's fees.

"So, ultimately, the Court awards the party that the—the possession of the property they have. I grant a judgement to the respondent in the amount of $12,000, and I grant the parties a divorce.

"With that, Mr. McAfee, your client's the petitioner, is there anything I've not ruled upon—and—and one other thing I do wanna add before you answer that question. There [were] some other contributions made to this joint account. One was a tax refund that the respondent brought up to the Court, a federal tax refund of about—I think it was $1200, but the Court also notes the petitioner's tax refund went into that account. It was a lot more significant of $6,070. And the Court didn't consider those to be premarital or non-marital funds. And so I just wanted to address that 'cause that was part of the evidence."

On January 20, 2021, the district court filed a journal entry in which it journalized its findings and conclusions stated on the record. Thereafter, Lana filed a timely notice of appeal.

ANALYSIS

On appeal, Lana raises three issues. First, Lana contends that the district court abused its discretion when it concluded that Earnest did not dissipate the parties' assets during the marriage. Second, Lana contends that the district court abused its discretion in dividing the parties' property. Third, Lana contends that the district court erred by failing to grant her attorney fees for successfully bringing a motion to compel Earnest to produce certain documents during the divorce action.

*Dissipation of Assets*

Lana's primary argument is that the district court erred when it concluded that Earnest did not dissipate the parties' assets during the marriage. A district court's division of property in a divorce action is governed by K.S.A. 2020 Supp. 23-2801 et seq. A

8

district court has broad discretion when adjusting the property rights of the parties involved in a divorce proceeding. As a result, the district court's property division "will not be disturbed on appeal absent a clear showing the court abused that [broad] discretion." *In re Marriage of Vandenberg*, 43 Kan. App. 2d 697, 715, 229 P.3d 1187 (2010) (citing *In re Marriage of Wherrell*, 274 Kan. 984, 986, 58 P.3d 734 [2002]). It is also important to recognize that although the division of property in a divorce proceeding must be just and reasonable, it need not be equal. *In re Marriage of Traster*, 301 Kan. 88, 111, 339 P.3d 778 (2014).

A judicial action constitutes an abuse of discretion if (1) it is arbitrary, fanciful, or unreasonable; (2) it is based on an error of law; or (3) it is based on an error of fact. *Biglow v. Eidenberg*, 308 Kan. 873, 893, 424 P.3d 515 (2018). If reasonable persons could differ as to the propriety of the action taken by the district court, then it cannot be said that the action was arbitrary. *In re Marriage of Bradley*, 282 Kan. 1, 7, 137 P.3d 1030 (2006). The party alleging the abuse of discretion—in this case Lana—has the burden to establish such an abuse. *Gannon v. State*, 305 Kan. 850, 868, 390 P.3d 461 (2017).

Under K.S.A. 2020 Supp. 23-2802(c), a district court is to consider the following factors in exercising its discretion to divide marital property:

> "(1) The age of the parties; (2) the duration of the marriage; (3) the property owned by the parties; (4) their present and future earning capacities; (5) the time, source and manner of acquisition of property; (6) family ties and obligations; (7) the allowance of maintenance or lack thereof; (8) dissipation of assets; (9) the tax consequences of the property division upon the respective economic circumstances of the parties; and (10) such other factors as the court considers necessary to make a just and reasonable division of property."

Lana does not argue that the district court failed to consider the statutory factors. Indeed, our review of the record reveals that the district court addressed the statutory factors in seeking to equitably divide the parties' property. Instead, Lana argues that the district court failed to consider the evidence supporting Lana's claim that Earnest dissipated assets. In particular, Lana points to the evidence that Earnest wrote checks to cash without accounting for what he did with the money. Lana also suggests that the district court failed to consider the transfers that Earnest made from the parties' joint account into his personal account during the marriage.

As discussed above, the district court held a trial in which both parties testified and nearly 400 pages of financial records were admitted into evidence. Likewise, both parties testified at trial about the use of their funds during the marriage. Although Lana testified that Earnest wrote several checks to cash during the marriage and she did not know how the cash was used, she admitted that she regularly accessed the joint account during the marriage and never questioned her husband's use of the funds.

Regarding writing checks to cash, Earnest testified:

"Q: And you did write checks on occasion for cash; is that right?

"A: Yes.

"Q: And was that something you had normally done before you got married?

"A: I—I always keep cash. Yes, I do. And it varies on the—on the amount, but I carry cash because in my business, there's a lot of times that I'll have appointments with customers and the meeting will go into the lunch hour. I'll take them to lunch, and some places that we go, they didn't—they don't take credit cards. Other times it was just more simple to pay cash. And I don't . . . don't know. Like, if I drive-thru McDonald's for lunch, I'm not (inaudible) a kind of guy that's gonna give them a debit card for a cup of coffee or something. I just like to pay with cash. And—I told Lana when we got together

10

that I wanted her to carry cash too. I wanted her to always have cash in her purse in case she needed it."

Earnest also testified:

"Q: Okay. And so how—how did you normally pay your bills out of this account?

"A: Well, being old-fashioned, I always wrote checks. I didn't have that many bills, so I always wrote checks. Lana had always done it the other way and done it electronically, and I could see that was a—that was a very simple way to do it, and I told her I was fine with—with her doing that. And she loaded all the stuff on the laptop, 'cause I really didn't know how to do it, and she loaded all the . . . payables on the laptop and paid the bills. And there were some that came in that—that weren't, like, monthly, so if it was just a one-time deal, I would write a check. But, obviously, she knew the password to the—to the laptop or she wouldn't have been able to pay the—pay the bills—.

"Q: Okay.

"A: —like she did."

In addition, Earnest testified that he cashed a few checks to pay for landscaping in Florida because the parties did not have a bank account there. In her testimony, Lana disputed that cashed checks were used in this way but did not provide another explanation for how the landscaping was financed. As a result, it was left to the district court to weigh the evidence about the use of the funds in the parties' joint account.

Similarly, both parties also testified about the transfers made to Earnest's American Express account. In particular, Earnest testified that several transfers were made to pay bills during the marriage.

11

"Q: Okay. And, again, do you have a—just for instance, on the statement of—ending 12/31 of '18, there's a—an American Express transfer of $5,000. Is that something you—you did typically if you needed money?

"A: Yeah. That—we—and we put some of her money in the—a considerable amount of money in the American Express savings account. We were actually sitting in the house in Florida, and I asked her about it. I said, Why don't we transfer some of that money to the American Express savings account? At least it will make some interest, because it didn't make sense to have 30 or $40,000 in a checking account that's noninterest bearing. And she was fine with that, so we put it in there. She had access to—to that balance as well. And—

"Q: (Inaudible)—

"A: —and, I mean, those were things that we discussed periodically. She—there was never anything held back from her.

"Q: The—the American Express—excuse me. The American Express savings account, she had access to that?

"A: Yes.

"Q: Okay. Did she ever approach you or have a discussion with you about any transfers from the American Express to—to this account?

"A: No. We—whenever we did that, we discussed it. We talked about doing it 'cause, obviously, some of the money that went into that was from the sale of her home. And it ultimately was her decision on what was—what was gonna be done with it, but we agreed in the beginning that if we had a bill, we were gonna pay it. So when we got short in the account, it would've been nice if in the joint account we had 10 or $15,000, but ultimately spending, like we did, we spent a lot of money on the house. Not only on the house, but on the—the belongings or the—the things—merchandise that we put in the house. And we needed to reimburse that account to be able to pay the credit card bills from time to

12

time, so that's why the transfers would come from the American Express savings account into this account so we could pay it."

Additionally, Earnest testified that the decision to transfer $25,000 to the American Express account was a joint decision to obtain interest on the money from their joint account:

"Q: Then on June the 4th, there was an American Express transfer of $25,000. Do you know what that's—

"A: That—

"Q: What that's for?

"A: That was one that—that we discussed when we were in Florida. And I said, There's no reason to leave that in the account. It makes more sense to put it in the American Express account to draw some interest. Although the interest rate's not high, it was a heck of a lot better than the checking account."

Earnest also testified that he transferred $10,000 into his American Express account at the end of the marriage to restore his premarital balance:

"Q: There's a—December 5th of '19, there's an American Express transfer for $5,000, and there's another one later on. What—what's the—can you give us the story on the— the transfers from American Express?

"A: Very simply, it was money that I had, actually, prior to meeting Lana, and I—it was money that I needed to pay the bills that were still coming in that belonged to both of us, so I took it out of my American Express savings account and put it in there to pay the bills."

Lana testified that she was neither added to Earnest's American Express account nor given the password during the marriage. However, Lana testified that she was aware

13

of some of the transfers to the account but chose not to question them because she trusted Earnest to make good decisions. Specifically, Lana testified:

> "Q: He testified that you had a discussion about earning interest and putting— transferring money from the joint account to his American Express personal account. Do you recall that?
>
> "A: I—the—what I recall on the American Express account is there were numerous times I ask him why I never signed a card to be added to that account, 'cause it's a savings—an American Express savings account.
>
> "Q: Right.
>
> "A: He said, '"You don't require—your—they don't require it. You're my wife. That's all they know.'" So I was misled and was told that I was on the account, and, in fact, I wasn't.
>
> "Q: Okay. And you had no access to it.
>
> "A: No.
>
> "Q: And there was never a discussion about transferring money to make more interest in that account?
>
> "A: Oh, he—he would—he would tell me that I'm gonna transfer money. At that point, though, a—again, I trusted him and relied on him to—to do the best he could with the investments with the American Express, unbeknownst to me that I wasn't on the account."

After hearing the conflicting testimony of the parties and considering the exhibits admitted into evidence, the district court found that Earnest had not dissipated the parties' assets. The district court explained that Earnest believed that his actions were "fair because [Lana] was receiving the funds from the sale of the Florida property. Let me be clear, I don't think there was any dissipation of assets, stealing of funds, hiding of funds

14

from cash. I think that was a lifestyle that [the parties] lived." Although reasonable minds may differ regarding this issue, it is not our role to replace our judgment for that of the district court. *In re Marriage of Bradley*, 282 Kan. at 7; see also *In re Marriage of Stegman*, No. 122,344, 2020 WL 7413620, at *3 (Kan. App. 2020) (unpublished decision).

Based on our review of the record on appeal, we find the district court's determination on the issue of dissipation of assets to be reasonable and that it was not based on a mistake of fact or law. We also find that the district court's decision was supported by substantial competent evidence. Thus, we conclude that the district court did not abuse its discretion in ruling on the issue of dissipation of assets.

*Division of Property*

Next, Lana contends that the district court abused its discretion in its final division of property. She argues that the district court's division of property was "unjust" because the district court did not account for all of the parties' debts and assets. Again, we review the district court's decision adjusting the property rights of the parties under an abuse of discretion standard. *In re Marriage of Vandenberg*, 43 Kan. App. 2d at 715. Likewise, as the party alleging an abuse of discretion, Lana continues to have the burden of establishing such abuse. *Gannon*, 305 Kan. at 868.

The record on appeal reflects that the district court explained at length its reasoning for dividing the parties' property. Faced with a difficult task, the district court tried to restore the parties to their premarital financial positions to the extent that it was possible to do so given their financial circumstances. Ultimately, in an attempt to make the division as equitable as possible, the district court ordered Earnest to pay Lana $12,000. We find the district court's division of property to be consistent with the factors

set forth in K.S.A. 2020 Supp. 23-2802(c) and to be reasonable based on the evidence presented at trial.

The district court explained that it was difficult to decide what is fair and equitable due to the short duration of the marriage, the assets brought into the marriage by each party, and the assets bought jointly by the parties during the marriage. Because there were not sufficient assets to restore the parties to their previous positions, the district court used percentages that reflected the premarital assets that each party brought into the marriage. Lana does not challenge the district court's use of percentages in dividing the marital property and we find the district court's approach to be reasonable under the circumstances presented. In this regard, it is important to reiterate that a property division in a divorce proceeding must be just and reasonable but need not be equal. *In re Marriage of Vandenberg*, 43 Kan. App. 2d at 715.

Further, while it is true that the district court did not discuss every piece of evidence submitted by the parties at trial, this does not mean that the district court failed to consider the evidence. Moreover, the district court appropriately acknowledged that it was not trying to account for every dollar but was instead attempting to make an equitable distribution of the property.

In making its ruling, the district court explained:

"[T]here [were] some benefits received from both parties from the payoff of certain items, and the petitioner—or, excuse me, the respondent may have received a slightly more significant benefit by virtue of the wedding rings being paid off and retaining the wedding rings.

"But, ultimately, the Court, in this division, thinks that that is equitable. I can't return the parties and restore them to 100 percent of what they were before. I don't think that would be fair. I don't think that would be equitable. I think the parties made joint

16

decisions. These parties are both sophisticated and of an age that they have the ability to make joint decisions, so I don't think I attribute whether the decisions were good or bad to one side or the other."

In sum, we find that the district court appropriately exercised its discretion in dividing the marital property. We also find that the district court appropriately followed Kansas law and considered the required statutory factors in making a just and reasonable division of the parties' assets based on the evidence presented at trial. We thus conclude that the district court's division of property should be affirmed.

*Attorney Fees*

Lana also contends that the district court erred by failing to require Earnest to pay her reasonable attorney fees that were related to a successful motion to compel that she filed during discovery. If the district court has authority to grant attorney fees, its decision whether to award fees is reviewed under the abuse of discretion standard. *Consolver v. Hotze*, 306 Kan. 561, 568, 395 P.3d 405 (2017). But when the language of an attorney fees statute makes an award mandatory, the question of whether to award fees is not within the district court's discretion. *Snider v. American Family Mut. Ins. Co.*, 297 Kan. 157, 169, 298 P.3d 1120 (2013).

Regarding motions to compel discovery, K.S.A. 2020 Supp. 60-237(a)(5) provides:

"If the motion is granted, the court must, and if disclosure occurs before the motion is granted, the court may, after giving an opportunity to be heard, require the party or deponent whose conduct necessitated the motion, the party or attorney advising that conduct, or both to pay the movant's reasonable expenses incurred in making the motion, including attorney's fees. But the court must not order this payment if:

17

"(i) The movant filed the motion before attempting in good faith to obtain the disclosure or discovery without court action;

"(ii) the opposing party's nondisclosure, response or objection was substantially justified; or

"(iii) other circumstances make an award of expenses unjust."

So, the statute requires the nonmoving party to pay reasonable attorney fees that are incurred by the filing of a motion to compel, unless the judge finds that the opposition to the motion was substantially justified or that other circumstances make an award of expenses unjust. See *City of Arkansas City, Kan. v. Anderson*, 19 Kan. App. 2d 344, 349, 869 P.2d 244 (1994). Here, it is undisputed that Lana filed a successful motion to compel discovery. Likewise, it is undisputed that the district court neither awarded Lana reasonable attorney fees nor concluded that a statutory exception applied.

On July 20, 2020, the district court held a hearing in which it granted Lana's motion to compel discovery. Yet the district court withheld deciding Lana's request for attorney fees related to bringing the successful motion to compel. In doing so, the district court stated:

"THE COURT: All right. Thank you. Today the Court's not going to grant attorney's fees. But . . . if you wanna renew that request later or at trial, you're welcome to do so, and the Court, at that point in time, will look at the issue. Probably be in a better spot to have known what the evidence was and—and what has occurred and be able to look at the documents requested and then the parties' respective resources and make some decision with regard to attorney's fees if you renew that request. And that's not a promise I'll award them, that's just the process that I'll go through."

Then, on September 4, 2020, the district court issued a journal entry in which it stated that it would delay "ruling on [Lana's] motion for attorney's fees until the facts are

18

developed at trial." Finally, at the hearing following the trial, the district court determined:

"Lastly, there was an issue of a request for attorney's fees on the Motion To Compel, and the Court considered this at length. And when I look at the overall documents in this case, when I look at the transactions that occurred, I don't see anything that causes the Court, I think, tremendous concern. Again, I don't think there was any dissipation of assets. I don't think anybody took advantage, per se, of anybody else. An— and if I did grant attorney's fees, I'd likely make a different order with regard to the amount that I've granted as a judgment. And so, ultimately, the Court is going to decline the request to award attorney's fees."

Similarly, in the journal entry and decree of divorce, the district court stated that it "denies Respondent's request for attorney's fees. The Court finds no dissipation of assets and no basis for awarding attorney's fees."

In response to Lana's argument on appeal, Earnest argues that the district court impliedly ruled that "other circumstances make an award of expenses unjust" when it decided that there was no dissipation of property. But the district court made no such conclusion either at the hearing on the motion to compel or in a subsequent journal entry. Once the district court granted Lana's motion to compel, the district court was obligated to comply with K.S.A. 2020 Supp. 60-237(a)(5). Because K.S.A. 2020 Supp. 60-237(a)(5) requires the district court to either award Lana's reasonable attorney fees for successfully bringing her motion to compel or conclude that one or more of the statutory exceptions apply, we reverse the district court's decision on the issue of attorney fees and remand for further proceedings.

Affirmed in part, reversed in part, and remanded with directions.

19